**Irwin A. POPOWSKY, Consumer Advocate, Petitioner**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Dec. 13, 2006.

Decided Feb. 20, 2007.

---

Joel H. Cheskis, Asst. Consumer Advocate, Harrisburg, for petitioner.

Joseph K. Witmer, Asst. Counsel, Harrisburg, for respondent.

Thomas A. Leonard and Suzan DeBusk Paiva, Philadelphia, for intervenor, Verizon Communications Inc.

BEFORE: COLINS, President Judge, McGINLEY, Judge, PELLEGRINI, Judge, LEADBETTER, Judge, COHN JUBELIRER, Judge, SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY Judge PELLEGRINI.

Irwin A. Popowsky, acting on behalf of the Office of Consumer Advocate (OCA), appeals from an order of the Pennsylvania Public Utility Commission's (Commission) approval of the merger between Verizon Communications, Inc. (Verizon) and MCI, Inc. (MCI) and its subsidiaries (also referred to as Joint Applicants).[1]

## A. Background

Verizon[2] is the largest incumbent local exchange company (ILEC) and MCI[3] is the leading competitive local exchange car-

1. Those subsidiaries are McIver Access Transmission Services, LLC MCI World Com Communications, Inc. MCI WorldCom Network Services, Inc.; TTS National, Inc.; Teleconnect Long Distance Services and System Co. d/b/a Telecom USA (MCI) in Pennsylvania.

2. "Verizon is a Delaware corporation whose telephone operating company subsidiaries provide telecommunications services on a regulated and unregulated basis in 28 states, Puerto Rico and the District of Columbia, serving 53 million access lines." (Application at 2–3.) Verizon's local telephone subsidiaries are subject to public utility regulation in the jurisdictions in which they operate. Id. They are subject to regulation by the Federal Communications Commission (FCC) for the services they provide pursuant to federal tariffs and the Federal Communications Act of 1934. Id. Verizon Pennsylvania, Inc. and Verizon North, Inc. provide regulated telecommunications services in Pennsylvania. Id.

Verizon's domestic telecommunications services include the provision of exchange telecommunication services, including switched local residential and business services, local private line, voice and data services and Centrex services. Id. Verizon also provides intraLATA and interLATA toll and interexchange

services, as well as exchange access services, including switched access and special access services. Id. Verizon provides these wireline services to consumers, small and enterprise businesses and to other telecommunications carriers. Id. Verizon's other domestic subsidiaries provide voice and date wireless services, information services including directory publishing, and electronic commerce. Id. Verizon's international subsidiaries provide wireline and wireless communications operations and investments. Id.

"In 2004, Verizon had annual operating revenues of approximately $71 billion. Id. Verizon has a national workforce of 210,000 employees, including over 17,000 employees in Pennsylvania. Id. Verizon has a strong balance sheet and investment-grade credit rating and is a stable, viable enterprise. Id." (ALJ's November 15, 2005 decision, Reproduced Record at 967–968a.)

3. "MCI is a Delaware corporation whose subsidiaries provide telecommunications services on a regulated and unregulated basis through the United States and in several foreign countries." Application at 3–4. MCI's subsidiaries provide services to business and government customers including 75 federal government agencies. Id. Among the enterprise services MCI provides through its sub-

rier (CLEC) in Pennsylvania. Verizon provided service to approximately six million customers in Pennsylvania, and its operating revenues in Pennsylvania were approximately $3,344,493,000. (Reproduced Record at 282a, 312a.) Verizon provided service to almost 80% of the customers in its Pennsylvania service territory. MCI was the fifth largest provider of local exchange services in Pennsylvania with 246,-058 residential customers. (Reproduced Record at 336a.) Verizon and MCI had overlapping facilities in 45 of Verizon's wire centers, mainly concentrated in the Philadelphia and Pittsburgh metropolitan areas.

On February 14, 2005, Verizon and MCI entered an Agreement and Plan of Merger where MCI became a wholly-owned subsidiary of Verizon. The merger was prompted by the nationwide decline in Verizon's and MCI's core local and long distance services caused by regulatory changes, marketplace developments and changes due to technology and the two companies' belief that they could complement each other's weaknesses while improving growth.[4] (Reproduced Record at 336a.) Verizon and MCI believed that they had complementary assets and expertise which, if merged, would benefit them both—"MCI possesses a significant base of large enterprise customers and an Internet–Protocol–based national and international network, while Verizon serves only a limited number of large enterprise customers-primarily within its own region—and lacks substantial Internet backbone or interLATA transmission facilities." (Commission's January 11, 2006 decision at 16.) Verizon and MCI made various public estimates regarding the synergy savings they

---

sidiaries are a comprehensive portfolio of local-to-global business data, internet, and voice services including Internet Protocol (IP) network technology, Virtual Private Networking, Synchronous Optical Network (SONET) private line, frame relay, Asynchronous Transfer Mode (ATM) and a full range of dedicated, dial and value-added internet services. *Id.*

Some of MCI's subsidiaries are subject to public utility regulation in the jurisdictions in which they operate. MCI's subsidiaries provide consumer services, including interstate long distance services, intrastate toll services, competitive local exchange services, and other telecommunications services in Pennsylvania. *Id.* MCI's subsidiaries are also subject to regulation by the FCC for the interstate services they provide. *Id.* In 2004, MCI had annual operating revenues of approximately $21 billion. *Id.* "MCI has over 42,500 employees nationally and internationally, including approximately 325 employees and contractors in Pennsylvania. *Id.*" (ALJ's November 15, 2005 decision, Reproduced Record at 968–969a.)

4. The Commission found that: "Nationally, Verizon's wireline business has declined. Total Verizon retail lines in service fell by 18% between December 2001 and December 2004. Verizon's retail lines declined in each customer category, including residential and all business customers. Between the first quarter of 2002 and the fourth quarter of 2004, demand for Verizon-provided carrier switched access service (measured by switched access minutes of use) fell from 59.2 billion to 44.1 billion minutes (a decline of twenty-five percent.) (I.D., finding of Fact 6; Jnt. Stmt. 1 at 12–13.)" (Commission's January 11, 2006 decision at 6.) Regarding MCI, it found, "MCI's mass market business was in a continuing state of decline. Joint Applicants state that this decline is irreversible. (MCI Stmt. 1.0 at 16.) Nationally, MCI's mass market revenues fell by twenty percent from 2003 to 2004. (Jnt. Stmt. 1 at 10.) MCI's declining wireline revenues and sales volumes led MCI to decide not to attempt to reverse the decline, but rather to dramatically reduce its marketing efforts to mass market customers, including very significant reductions in mass market advertising and its mass market sales force, as well as closing several call centers. (Jnt. Stmet. 1 at 11; Stmt. 1.1 at 18.) MCI has also had to increase its charges for mass market services which would further hasten its loss of market share. (MCI Stmt. 1.0 at 15–17.)" (*Id.* at 8.)

expected as a result of the merger, with one being that the net present value of savings was going to be $7 billion nationwide.[5] Because Verizon lines in Pennsylvania account for 9.2% of all lines served nationwide, Pennsylvania's portion of the estimate of the benefits of the merger would be $644 million based on publicly available figures. If the synergy estimates were split between the merged entities and the ratepayers, the consumers' share of the savings would be between $321 million and $403 million to $814 million.[6] (Reproduced Record at 312a.) These figures are significant because, according to the OCA, the Commission has often required merging utilities to flow through a portion of the savings to customers as a condition for merger approval.

To merge, Verizon and MCI needed the approvals from federal agencies that had regulatory oversight as well as the public utility commission in any state in which they did business. The merger was approved by the Antitrust Division of the United States Department of Justice (Department of Justice) on October 27, 2005, when it entered into a Consent Decree providing for "voluntary commitments"[7] by Verizon and MCI that would mitigate some of the anti-competitiveness concerns of the merger. The FCC approved the merger of Verizon and MCI with condi-

5. Estimated merger savings provided by Verizon and MCI to the Commission and this Court under seal indicate those savings would be substantially higher than the publicly available figures.

6. This figure is arrived at by multiplying the estimated total synergy savings by 9.2%, the Pennsylvania percentage estimate of Verizon's nationwide operations, and dividing by 2.

7. Those "voluntary commitments" provided:

1. For a period of two years, no Unbundled Network Elements (UNE) rate increases in state-approved rates except for rates that are subject to currently pending appeals. UNEs are defined as physical and functional elements of the network, e.g., Network Interface Devices, local loops, switch ports, and dedicated and common transport facilities. When combined into a complete set in order to provide an end-to-end circuit, the UNEs constitute a UNE–P or UNE–Platform;
2. Within 30 days after the Merger closing Date, the applicants will exclude the applicants' (MCI) fiber-based collocation arrangements in identifying those wire centers in which the applicants claim "no impairment" under Section 51.319a(a) and (e), 47 F.F.R. §§ 51.319(a) and (e), of the FCC's rules;
3. Implementation of a Performance Metrics Plan (PMP) for interstate special access services with data provided on a quarterly

basis for those affiliates that meet the definition under Section 251(h)(1)(A) and (B)(i) of TA–96, 47 U.S.C. § 251(h)(1)(A) and 251(B)(i);
4. No increase for 30 months in rates paid by existing DS1 and DS3 customers wholesale metro private line services provided in Verizon's local service areas;
5. For 30 months following the Merger Closing Date, the applicants will offer special access offerings to non-affiliated providers that the applicants provide to their affiliates;
6. For 30 months following the Merger Closing Date, the applicants will not provide a new contract tariff to its Section 272(a) affiliate(s) until it certifies to the FCC that it provides service under that tariff to an unaffiliated customer, other than the applicant and its affiliates, under § 69.727 of the FCC's rules;
7. For 30 months following the Merger Closing Date, the applicants will not increase their rates for interstate tariffs, including contract tariffs, for DS1, DS3 and OCn special access services. This commitment does not apply to advanced services provided by a Separate Advanced Services affiliate under the terms of the *BA/GTE Order* nor does it apply to DS0 services as defined in paragraph 2 of the *SBC/Ameritech Order, In re Applications of Ameritech Corp., Transferor, and SBC Communications Inc., Transferee ...,* CC Docket No. 98–141, 14 FCC Rcd 14712, 1999 FCC LEXIS 5069 (1999).

tions.[8]

## B. Proceedings before the Public Utility Commission

On March 7, 2005, as required by Section 1102 of the Public Utility Code, 66 Pa.C.S. § 1102, which requires that a new certificate of public convenience be obtained when a public utility merges with another company, Verizon and MCI filed a Joint Application with the Commission for approval of their merger in Pennsylvania that was later amended.[9] For the Commission to approve the merger by granting a new certificate of public convenience, it had to "find or determine that the granting of such certificate is necessary or proper for the service, accommodation, convenience, or safety of the public." Section 1103 of the Public Utility Code, 66 Pa.C.S. § 1103. If it decided to grant the certificate, the Commission could impose such conditions "as it may deem to be just and reasonable." *Id.* Those seeking approval of a merger must prove more than the mere absence of any adverse effect upon the public. They have to prove that the "proponents of a merger demonstrate that the merger will affirmatively promote the 'service, accommodation, convenience, or safety of the public' in some substantial way." *City of York v. Pennsylvania Public Utility Commission*, 449 Pa. 136, 141, 295 A.2d 825, 828 (1972).

In their Joint Application, Verizon and MCI alleged that the proposed merger would: a) benefit the public interest; b) benefit their customers, including enterprise and government customers and consumers and small business customers; c) benefit the American economy; d) benefit investors in both companies; e) benefit employees of both companies; and finally, f) benefit the Commonwealth of Pennsylvania. They stated:

## E. Benefits to the State's Economy

33. Verizon has a long history of corporate responsibility and good citizenship in the communities that it serves and it will continue that tradition after this transaction is concluded, including in this state. MCI has a practice of providing good jobs and cutting-edge network technology and this acquisition will only enhance that capability. Thus, the communities served by the combined company will benefit from this transaction.

34. In addition, there will be no anti-competitive effect of this acquisition in Pennsylvania or nationally. As discussed above, Verizon does not currently address the upper end of the enterprise market with a wide array of services, nor has it been equipped to address customers with nationwide interests in that market. MCI, on the other hand, is an acknowledged leader in the market

---

8. The Department of Justice and the FCC determined that with such commitments in place, the merger at the federal level was in the public's best interest. According to Verizon, the following states also issued merger approval orders with few, if any, additional conditions: North Carolina (4/27/05); Mississippi (6/30/05); Louisiana (8/19/05); Hawaii (9/12/05); Utah (9/16/05); Virginia (10/6/05); District of Columbia (10/20/05); California (11/18/05); New York (11/22/05); Vermont (11/29/05); Ohio (11/29/05); New Jersey (12/2/05) Arizona (12/9/05); West Virginia

(12/13/05); Alaska (12/17/05); Maine (12/22/05); Washington (12/23/05); Tennessee (4/12/06); and Wyoming (9/22/06). "Other states either declined to review or had no requirement to review." (Intervenor Verizon's brief at 1, n. 1.)

9. They filed an amendment to the Joint Application on March 29, 2005, modifying certain financial and other terms in the Agreement. On May 1, 2005, they filed a second amendment to the Agreement.

for enterprise telecommunications services. For its part, Verizon is a recognized leader in services to consumers and small businesses and is **committed to building out a broadband network to improve those services.** Competition, including increasingly important intermodal competition, will continue unimpaired.

35. The new competition of the 21st century is between and among those carriers with a comprehensive network—such as cable and wireline. Thus, MCI and Verizon will each benefit from the strengths of the other, to the long-term benefit of the enterprises, businesses, government entities, and consumers in this state. (Emphasis added.)

Numerous parties filed petitions to intervene or protest, including the OCA and Senator Mary Jo White (Senator White);[10] the Office of Small Business Advocate (OSBA); the Communications Workers of America (CWA); Qwest Communications Corporation (Qwest); Competitive Carrier Group (CCG), a coalition of six competitive carriers;[11] Full Service Computing Corporation t/a The Full Service Network (FSN); and a coalition of 18 rural incumbent local exchange carriers (LECs), referred to as the Rural Telephone Company

Coalition (RTCC).[12] They contended that the merger was not in the public interest if conditions that they suggested were not adopted.

Specifically, Senator White argued for a more accelerated deployment of broadband services in Pennsylvania by Verizon and MCI as a condition of merger approval. Her concerns were that the merger would have a great affect on customer choice for telephone service, particularly in rural parts of Pennsylvania where there were few competitive options. She stated that "the unavailability of broadband or high speed connection services, and the high cost of wireline connections provided by Verizon, significantly impairs [enterprise customers] ability to utilize important technology and equipment." (Reproduced Record at 373a.) As an example, she pointed to a hospital in her district that was unable to utilize necessary diagnostic equipment due to its inability to secure broadband service, thereby reducing its capability and productivity and creating a genuine risk of harm to patients.

The OCA argued that Pennsylvania customers of Verizon should share in the cost savings realized due to the merger, a quality of service monitoring process should be

10. Senator White is a senator for Pennsylvania's 21st District consisting of Clarion, Forest and Venango counties and parts of Butler, Erie and Warren counties.

11. CCG is comprised of the following companies: Broadview Networks, Inc.; Broadview NP Acquisitions Corp.; BridgeCom International, Inc.; CTC Communications Corp.; DIECA Communications, Inc. d/b/a Covad Communications Company; and XO Communications Services, Inc.

12. Those companies include: Armstrong Telephone Company–Pennsylvania; Armstrong Telephone Company–North; The Bentleyville Telephone Company; Buffalo Valley Telephone Company; Conestoga Telephone and Telegraph Company; D & E Telephone Company; The Hancock Telephone Company; Hickory Telephone Company; Lackawaxen Telephone Company; Laurel Highland Telephone Company; The North–Eastern Pennsylvania Telephone Company; North Penn Telephone Company; North Pittsburgh Telephone Company; Palmerton Telephone Company; Pennsylvania Telephone Company; Pymatuning Independent Telephone Company; South Canaan Telephone Company; Venus Telephone Company; and Yukon–Waltz Telephone Company. Originally, ALLTEL Pennsylvania, Inc. was a member of the coalition but it withdrew from participation in the proceeding by letter dated July 8, 2005.

implemented, DSL[13] service should be unbundled, and agreeing with Senator White, that broadband deployment should be expedited. Specifically, it proposed that a five-year cap be imposed on basic non-competitive service rates for residential and small business customers so that a portion of merger savings would flow through to customers by preventing the entity from implementing the inflation-based rate increases that would otherwise be permitted to be imposed on non-competitive services through its current price formula. (Reproduced Record at 313a.) The OSBA also wanted a rate cap imposed as well as other conditions, and the CWA wanted service quality conditions imposed in Pennsylvania similar to conditions that Verizon had to meet in other states to ensure the safety, quality and reliability of Verizon's service throughout Pennsylvania. The OCA, Quest, FSN and the LECs wanted protection for service that they purchased from Verizon and MCI to serve local customers to lessen the anti-competitive effects of the merger. Specifically:

● *Unbundled DSL.* The OCA alleged that too many Verizon customers had to purchase Verizon voice service to obtain Verizon's DSL service which impeded the ability of other providers of voice services to compete. It urged that DSL service be unbundled.

● *Elimination of Competition for Special Access Service.*[14] Qwest argued that the merger would have an adverse impact on rates for special access service because it and other CLECs depended on that service they purchased from Verizon in order to serve their retail customers. It alleged that MCI exerted influence on Verizon special access pricing from which it benefited because MCI had alternative facilities that allowed a carrier to bypass Verizon's facilities enabling them to get more deeply discounted prices from both. Qwest recommended that the Commission impose on Verizon and MCI a condition that they continue to offer intrastate and interstate special access, private line or its equivalent at the lowest rates offered by either Verizon or MCI.

● *Allow Wholesale Customers to Terminate Service Contracts to Spur Competition.* Qwest argued that Verizon should give its wholesale customers the option of terminating their existing contracts with Verizon without incurring penalties for one year after the merger closes which would spur competition by giving the company acquiring MCI's divested facilities and customers an opportunity to attract Verizon's wholesale customers.

● *Unbundled Network Elements.* CCG and FSN are concerned that the merger of Verizon and MCI is going to lead to a diminished competition in the local business markets served by CLECs competing on loop and transport arrangements and it is directly attributable to the removal of MCI as a competitor in the wholesale market. They suggested conditions be imposed on Verizon and MCI regarding unbundled network elements to counter the anti-competitive effects of the merger including, among many others, continued availability of UNE–P for mass market customers and the capping

**13.** DSL means "digital subscriber line" and refers to a modern technology that uses existing twisted pair telephone lines to transport high-bandwidth data.

**14.** Special Access Service refers to "[s]ervice provided over dedicated, nonswitched facilities by local exchange telecommunications companies to interexchange telecommunications carriers or other large volume users which provides connection between an interexchange telecommunications carrier or private network and a customer's premises." 66 Pa.C.S. § 3012.

of rates of all § 251 UNEs for five years or until the Commission determined that anti-competitive effects have been mitigated.

● *RTCC Interconnection and Traffic Transit Conditions.* RTCC averred that its LECs had joint facilities with Verizon and MCI at many locations in Pennsylvania. Those facilities ensured the seamless exchange and interexchange of traffic between customers of Verizon, MCI, RTCC and other third party carriers by providing for the exchange of traffic over Verizon tandem facilities for intraLATA toll traffic, Extended Area Service traffic, commercial mobile radio service, CLEC and other traffic. However, the use of the joint facilities was not adequately covered by existing agreements and Verizon refused to cooperate with the RTCC LECs in addressing necessary provisions related to the exchange of third party traffic. RTCC alleged that the merger would lead to a further degradation of its relationship with Verizon unless RTCC's conditions were imposed, including, *inter alia:* the maintenance of separate Verizon and MCI affiliates for the future; the merged entity shall ensure fair and open access to RTCC LECs of underlying Internet facilities that it may control; the merged entity shall be required to continue to honor all existing obligations and service arrangements that Verizon had with the RTCC LECs.

### B. The ALJ's Decision

After public hearings were held, by order dated November 15, 2005, the ALJ, concluding that Verizon and MCI had met their burden of proving by a preponderance of the evidence that the merger was in the public interest, recommended to the Commission approval of the merger and the grant of the certificate of public convenience without the imposition of the conditions proposed by the OCA and the other intervenors. Because of the Department of Justice's Consent Decree and conditions that it imposed, the ALJ discounted any concern that competition would be adversely affected by the merger. He also found that the Consent Decree made a Pennsylvania-specific analysis of the anti-competitive effects of the merger inappropriate. Because MCI and Verizon were interested but had not offered mobile IP services to enterprise customers that would give them mobility and allow applications to be accessed by them no matter where they were, the ALJ found that the proposed merger would result in substantial benefits for enterprise customers.[15] Regarding mass market customers (residential and small business customers), the ALJ found that although the enterprise market was the primary target of the merger, the merger would provide the mass market with substantial benefits as well because they would receive the residual benefits of the merged company's efforts to better serve enterprise customers, i.e., they would be offered more technologically advanced communications, information and entertainment services more quickly than either Verizon or MCI could offer standing alone.

The ALJ also rejected the conditions proposed by the OCA and the other intervenors as either unnecessary or beyond the Commission's jurisdiction to impose. He found that the sharing of merger cost savings with consumers through implementation of rate caps pursuant to Chapter 30 of the Public Utility Code[16] was

15. "Enterprise customers" are large business customers, federal and large state government customers and medium-sized business and government customers.

16. Pennsylvania Public Utility Code, 66 Pa. C.S. §§ 101–3316. (*See* Reproduced Record at 1019a.)

unnecessary in light of the substantial public benefits that the merger would provide to Pennsylvania consumers; that it was unnecessary to implement service quality monitoring because it was not shown that the merger would lead to decline of service; and that the Commission was precluded under Chapter 30 of the Pennsylvania Public Utility Code to require Verizon to accelerate its deployment of broadband services as a condition of its approval of the merger. Regarding the conditions requested to ameliorate the anti-competitive effects of the merger, the ALJ found that the FCC had jurisdiction (Unbundled DSL Service; Special Access Service; Unbundled Network Elements) or that they were not appropriate matters to be raised in this proceeding (RTCC Interconnection and Traffic Transit Conditions).

Exceptions to the ALJ's decision and order were filed by the OCA, Senator White, the OSBA, RTCC and FSN contending that the merger should not be approved because Verizon and MCI failed to establish that the merger was in the public interest unless the conditions that it suggested were adopted.[17]

### C. The Commission's Decision

The Commission adopted the ALJ's decision approving the merger finding that

the Joint Applicants had established that it was in the public interest for the "service, accommodation, convenience, or safety of the public." 66 Pa.C.S. § 1103(a). While it acknowledged that the *City of York* standard required that there be an affirmative showing that the merger was in the public interest, the Commission went on to give its interpretation of the standard, stating that:

> "[t]he public interest standard is a broad standard that encompasses examining whether, for example, the 'merger will have an anti-competitive effect or will impair the technical, managerial or financial fitness' of the jurisdictional utilities affected to continue to provide adequate telecommunications services to Pennsylvania customers at just and reasonable rates." (See Bell/GTE Merger Order, slip op. at 13, (citing *Joint Application of PG Energy, Inc., et al. for Approval of the Merger into Southern Union Company*), Docket Nos. A–120011, *et al.*, (Order entered September 15, 1999) (PG Energy Order)).

(Commission's January 11, 2006 decision at 22–23.)

Like the ALJ, the Commission found that the merger was in the public interest

---

**17.** The OCA argued that the Joint Application should be rejected unless significant conditions were imposed on the merger because no evidence had been produced to show any affirmative public benefit, but there was evidence that it would negatively affect competition in Pennsylvania. Further, none of the alleged competitive alternatives were viable substitutes to ameliorate the alleged anti-competitive impact of further strengthening Verizon's dominant position in the market for traditional wireline services. The OSBA believed that eliminating MCI as Verizon's largest competitor in Pennsylvania would have an adverse effect on the telecommunications services for small business customers. RTCC withdrew its protest, not expressing opposition to the merger, but sought to have condi-

tions imposed if approved. It elected to directly raise its concerns with Verizon. FSN was opposed to the merger absent any conditions that provided for the continued availability of UNE–P for mass market customers at tariffed rates and conditions. Qwest wanted the merger denied without specific conditions imposed as stated before the ALJ. CCG argued that the merger was anti-competitive and required conditions to mitigate those competitive concerns. CWA also argued that the unconditional approval of the proposed merger was not in the public interest. Finally, Senator White asked the Commission to deny the Joint Application because Verizon and MCI failed to demonstrate that the service, accommodation, convenience or safety of the public would be promoted.

largely based on the federal approvals, noting that the FCC approved the merger of Verizon and MCI with conditions in conjunction with its approval of the merger of SBC Communications, Inc. and AT & T Communications, Inc. Adopting the ALJ's recommendation that "a comprehensive and Pennsylvania-specific analysis of the competitive effects of the merger was not appropriate in light of the [Department of Justice] Consent Decree reached between the [Department of Justice] and Joint Applicants," where the ALJ concluded that "the United States Department of Justice Antitrust Division (DOJ) [18] and the Federal Communications (FCC) have also thoroughly investigated the merger and have imposed conditions to ameliorate the anticompetitive effects of the merger." (Commission's January 11, 2006 decision at 32.) The Commission stated in its order approving the Verizon/MCI merger that the FCC was required to identify the public interest benefits stemming from a merger and addressed key service areas, including special access, service quality metrics for special access, retail enterprise, mass market, internet backbone and wholesale exchange. The FCC also addressed UNEs and intended to "enforce Joint Applicants' commitment not to seek an increase in state-approved rates for UNEs for two years, except for rates that are subject to current appeals in specific states, of which Pennsylvania is included." (Commission's January 11, 2006 decision at 13.) Additionally, the Commission found that based on the FCC's order, there would be, among other things, no increase for 30 months in rates for existing DS1 and DS3 customers' wholesale metro private line services provided in Verizon's local service areas; no increase in interstate tariffs, including contract tariffs, for 30 months following the merger closing date for DS1, DS3 and OCn special access services; the merged entity would offer special access offerings to non-affiliated providers that the merged entity provided to their affiliates for 30 months following the merger closing date; and the merged entity would not provide a new contract tariff to its Section 272(a) [19] affiliates for 30 months following the merger closing date until it certified to the FCC that it provided service under that tariff to an unaffiliated customer other than itself and its affiliates under § 69.727 [20] of the FCC's rules. The Commission also took official notice of the Department of Justice's Consent Decree where Verizon and MCI agreed to

18. The Commission, though, did agree that the questions of market concentration present in this case were not present in the SBC/AT & T merger, thereby distinguishing the two proceedings "solely to the extent that our evaluation of the public interest must consider the competitive impacts of the transaction as part of the broader public interest analysis." (Commission's January 11, 2006 decision at 28.) However, it found that there were substantial similarities in the two proceedings because in both, there was an irreversible decline in revenues and market share in Pennsylvania and nationally, particularly in the mass market. Additionally, because the FCC had resolved the SBC/AT & T merger and the Verizon/MCI merger conjunctively, the Commission believed that the FCC's "virtual simultaneous consideration of the two proceedings suggests the interchangeability of the two proceedings in the FCC's analysis of market power considerations." (Commission's January 11, 2006 decision at 29.) Consequently, the Commission determined that the merger of Verizon and MCI met the standards in *City of York*, and approved the merger request without any further conditions other than those imposed by the Department of Justice in the Consent Decree and the FCC conditions.

19. The Commission did not clarify what Section 272(a) referenced.

20. Similarly, the Commission did not clarify the reference to Section 69.727 of the FCC's rules.

divest certain assets for lateral connections to certain buildings in eight metropolitan areas where only they had direct connections. Based on those conditions by those agencies, it found that the merger would be in the public interest.

Moving to the concerns of the parties who filed exceptions urging that the Joint Application be rejected because it had not been shown that the merger was in the public interest unless conditions were imposed, the Commission went on to note that Section 1103(a) of the Public Utility Code, 66 Pa.C.S. § 1103(a),[21] provided that the Commission *may* impose conditions in granting a certificate of public convenience once it determines that the proposed merger is in the public interest. It then went on to discuss each of the objectors' suggested conditions and found, like the ALJ, that no additional conditions were necessary.

The Commission did, however, agree with the exceptions filed by Senator White and the OCA, that Section 3019(b)(4) of the Public Utility Code (Chapter 30) was not a limitation on the Commission's ability to impose conditions under the separate authority of Section 1103 of the Public Utility Code. With that said, the Commission then took administrative notice that the Verizon companies were in full compliance with their approved Chapter 30 Plans, and in its June 30, 2005 Network Modernization Plan, it had exceeded its commitment to provide broadband avail-

ability in the rural, suburban and urban exchanges it served by one percent, five percent and 22%. Based on its history, the Commission concluded that Verizon companies were making significant progress in its deployment of a state-of-the-art broadband network and no order requiring accelerated deployment was necessary. Adopting the outcome, if not the reasoning of the ALJ's decision, it strongly encouraged Verizon to "continue to strive to accelerate its broadband network deployment to those areas of the state where such service is currently lacking before the 2015 deadline." (Commission's January 11, 2006 decision at 50.)

### Dissent of Vice Chairman Cawley

Vice Chairman James H. Cawley (Vice Chairman Cawley) dissented because the evidence showed that the only parties who would benefit from the merger would be Verizon and MCI. He found that the OCA and the OSBA persuasively demonstrated that the proposed merger would adversely affect the competitive structure and functions of the telecommunications services market in Pennsylvania, as well as the residential and small commercial consumers of retail telecommunications services. He also noted that the staff of the Office of Special Assistants (OSA) had presented to the Commission an in-depth analysis, along with a set of recommendations modifying the ALJ's initial decision imposing three modest conditions on the proposed merger,

---

**21.** 66 Pa.C.S. § 1103(a) provides in relevant part:

> Every application for a certificate of public convenience shall be made to the commission in writing, be verified by oath or affirmation, and be in such form, and contain such information, as the commission may require by its regulations. A certificate of public convenience shall be granted by order of the commission, only if the commission shall find or determine that the grant-

> ing of such certificate is necessary or proper for the service, accommodation, convenience, or safety of the public. The commission, in granting such certificate, *may impose such conditions as it may deem to be just and reasonable.* In every case, the commission shall make a finding or determination in writing, stating whether or not its approval is granted. (Emphasis added.)

which, if accepted, he would have approved the merger, but they had been rejected.[22]

He went on to state that the Commission failed to review proposed mergers under Sections 1102(a)(3) and 1103(a) of the Public Utility Code, 66 Pa.C.S. §§ 1102(a)(3) and 1103(a), and its duty to impose conditions when necessary to "compensate for merger proposals that lack the requisite public interest." He stated this authority was "independent of the parallel merger review authority that is exercised by the U.S. Department of Justice (U.S.DOJ), and federal administrative regulatory agencies such as the Federal Communications Commission (FCC). If this were not so, there would be little point in seeking our approval in the first point."[23] (Vice Chairman Cawley's December 15, 2005 dissent at 2.) He then addressed the fact that Verizon and MCI did not demonstrate that the merger would produce substantial affirmative benefits for Pennsylvania end-user consumers of telecommunications services as required under the standards set forth in *City of York.* Rather, he pointed out that if any benefits were to accrue at all, they would primarily benefit the large institutional "enterprise customers" which the ALJ and Commission acknowledged. He also addressed, among other things, the concerns regarding the lack of broadband services in rural and Northwestern Pennsylvania and noted that no part of the $321 million that would accrue from the proposed transaction was going to be diverted for the end-user consumers to address the "digital divide."

Regarding the anti-competitive effects of the merger, Vice Chairman Cawley found that by the Commission rejecting the OSA staff's recommendation, which was either an intentional refusal to enforce the Code of Conduct[24] or worse, the selective enforcement of that regulation, the result would be that if Verizon and MCI ever chose to engage in anti-competitive behavior, they would be given free reign to reference the Commission's Order approving their merger as superseding the Code of Conduct which would be doing a disservice to the Commission's "past laborious efforts to develop the Code of Conduct as a concrete policing mechanism of the Verizon ILECs' 'market power' within this Commonwealth." (Vice Chairman Cawley's December 15, 2005 dissent at 10.) Essentially, Vice Chairman Cawley

---

22. Those conditions were that the merger be conditioned upon: 1) providing to other competitors the UNE–P that was previously provided by Verizon to MCI; 2) providing service quality reporting; and 3) complying with existing affiliated interest requirements of Chapter 21 of the Public Utility Code.

23. Vice Chairman Cawley cited the following language from the FCC's final order to prove his point:

It is not the intent of these Conditions to restrict, supersede [sic], or otherwise alter state or local jurisdiction under the Communications Act of 1934, as amended, or over the matters addressed in these Conditions, or to limit state authority to adopt rules, regulations, or *performance* monitoring programs, or other policies that are not inconsistent with these Conditions. *In the Matter of Verizon Communications, Inc., and MCI, Inc. Applications for Approval of Transfer of Control,* WC Docket No. 05–75 (Rel. Nov. 17, 2005.)

(Vice Chairman Cawley's December 15, 2005 dissent at 2, n. 1.)

24. *See* 52 Pa.Code § 63.143(1)(i) which provides:

An ILEC may not give itself, including any local exchange affiliate or division or other corporate subunit that performs that function, or any CLEC any preference or advantage over any other CLEC in the preordering, ordering, provisioning, or repair and maintenance of any goods, services, network elements (as defined under sections 3(29) of the Communications Act of 1934 (47 U.S.C.A. § 153(39)), or facilities.

found the approval of the proposed merger, without conditions beyond those required by the FCC and the Department of Justice, would have detrimental affects for the overall level and scope of competition for the provision of telecommunications services to end-user consumers in the Commonwealth. He further found that to allow such a decision to stand would essentially be the same as delegating the Commission's independent authority to review proposed mergers between major telecommunications enterprises operating under the Commonwealth's regulatory jurisdiction to the federal government alone, bypassing the Commission's expertise and knowledge on the telecommunications services market structured and operated within the Commonwealth.

### D. This Appeal

■ The OCA is the only party which has filed an appeal with this Court from the Commission's decision.[25] Its primary contention is that the Commission's order, which failed to impose *any* conditions on the merger to ensure that benefits would accrue to Pennsylvania consumers, must be reversed and remanded for the imposition of conditions that will ensure that the merger satisfies the standards set forth in *City of York* which encompasses the requirements set forth in Sections 1102 and 1003 of the Public Utility Code.

■ As previously stated, in *City of York*, also involving a merger of telephone companies, our Supreme Court held that what was now Section 1103 of the Public Utility Code required "that those seeking approval of a utility merger demonstrate more than the mere absence of any adverse effect upon the public. [It] requires

that the proponents of a merger demonstrate that the merger will affirmatively promote the **'service, accommodation, convenience, or safety of the public'** *in some substantial way."* *City of York*, 449 Pa. at 141, 295 A.2d at 828. (Emphasis added.) In determining whether the Pennsylvania public is benefited in some substantial way, "it is contemplated that the benefits and detriments of the acquisition be measured as they impact on *all affected parties*, and not merely on one particular group or geographic subdivision as might have occurred in this case." *Middletown Township v. Pennsylvania Public Utility Commission*, 85 Pa.Cmwlth. 191, 482 A.2d 674, 682 (1984). The question here then is whether the Commission had substantial evidence in making the determination that the merger was in the public interest, and in making that analysis, whether it applied the proper criteria.

Usually, utility mergers can be justified as conferring a public benefit because under the traditional cost-based rate base/rate of return method, any financial savings gained due to economies related to the merger would ultimately be passed through to consumers through ratemaking in the form of lower annual revenue requirements and lower rates for ratepayers. In *City of York*, our Supreme Court approved the merger because the merger would lower those costs, explaining:

> Not only did the Commission correctly reject complainants' arguments that the merger would have the effect of raising rates, but the Commission indicated that the merger would likely have the opposite effect. The Commission expressly found that 'the economies that would be forthcoming in this present merger are

25. Our scope of review of a Commission's final order is limited to determining whether there has been a violation of constitutional rights, errors of law and whether findings are supported by substantial evidence. *Kirkwood Partnership v. Pennsylvania Public Utility Commission*, 133 Pa.Cmwlth. 478, 576 A.2d 1167 (1990).

considerable ...,' and that 'the beneficiaries of this merger will certainly be the subscribers of YORK and PRINCETON.'

*Id.* at 145, 295 A.2d at 830.

■ Unlike in *City of York*, because of the subsequent enactment of Chapter 30 of the Public Utility Code, merger savings are no longer a factor in determining whether the merger benefits the public in a substantial way. Chapter 30 changed the way rates are set for telecommunication utilities from the traditional cost-based rate base/rate of return method to an inflation-based formula. Unlike cost-based rate base/rate of return where merger savings would be reflected in rates, under the inflation based method, no savings from the merger are passed onto consumers, but are retained by the company. As a result, none of the merger savings would flow through to the customers; therefore, those savings do not constitute a basis to find that the merger is in the public interest.

Because rate savings are no longer passed on to consumers, an examination of the anti-competitive effects of the merger are important because if competition is eliminated, then Verizon would have less of a reason to temper rate increases or allow access to their competitors. The Commission discounted the anti-competitive effects of the merger relying on the FCC's and Department of Justice's approval of the merger and the conditions, a/k/a "voluntary commitments," that they imposed. (*See* n. 10.) While some of those conditions indirectly have some bearing on Pennsylvania ratepayers, they only address non-quantified federal concerns, and the Commission never undertook a Pennsylvania specific analysis of the anti-competitive effects of the merger on Pennsylvania customers. As pointed out by Vice Chairman Cawley's dissent, the FCC's final order recognized that the Commission could undertake state specific requests stating that it was not the FCC's intent by imposing the conditions to restrict, supersede or alter state or local jurisdiction or to limit state authority to adopt rules, regulations or performance monitoring programs or other policies that were not inconsistent with the conditions the FCC had imposed. By failing to perform a Pennsylvania specific analysis of the merger and relying on the FCC's merger approval order or the Department of Justice's Consent Decree with "voluntary commitments," the Commission failed to include in its analysis what were the anti-competitive effects that the merger would have on Pennsylvania consumers. For that reason alone, we would remand for that analysis to be made. However, even if the conditions imposed by those federal agencies ameliorated all of the anti-competitive effects in Pennsylvania, it would only establish that the merger was not detrimental to the public, not that needed substantial benefits were present to justify the merger.

The Commission contends that there are positive benefits flowing from the merger to the public. It only cites three positive benefits that the public would receive if the merger was consummated:

1. The merger would provide Verizon access to MCI's Internet backbone, and when combined with Verizon's ongoing fiber deployment program, they would create a platform to support a broad array of multimedia communications services and applications.

2. The merger would affirmatively benefit the public by promoting wireless and wireless broadband.

3. The public would benefit from the merger by continuing Verizon's long-standing corporate presence in Pennsylvania. Aside from these benefits, the

Commission indicates that it made a lengthy list of findings and conclusions of law which explained how Pennsylvania would particularly benefit from the merger.[26]

 However, those factors do not satisfy Joint Applicants' burden that the merger benefit the public in some substantial way. The finding that the merger would provide Verizon access to MCI's Internet backbone and, when combined with Verizon's ongoing fiber deployment program, would create a platform to support a broad array of multimedia communications services and applications, does not prove a benefit to the public. While that benefit may sound like it is offering something, after parsing it out, it promises nothing. Nowhere in Joint Applicants' application do they explain what "multimedia services" will be offered, make a commitment to offer those services, or state that those services would not be offered in absence of the merger.[27]

---

**26.** The Commission also found that there would be these additional benefits:

The American economy would receive the following benefits from the merger:

(a) The acquisition would create a global industry leader by strengthening simultaneously America's premier telecommunications network builder (MCI) and its leading service provider (Verizon).

(b) Utilizing MCI's powerful networking assets, the transaction would give Verizon greater ability to lead the telecommunications industry's revitalization through new investment in world-class networks and services.

(c) The transaction would ensure that key domestic communications networks were robust and technologically advanced, thus enhancing the economic viability and security of America's homeland.

The State's economy would receive the following benefits from the merger:

(a) Verizon would continue its long history of corporate responsibility and good citizenship in the communities.

(b) The combined company (Verizon and MCI) would benefit from MCI's practice of providing good jobs and cutting edge network technology.

After the merger was completed, competition for residential and small business customers in Pennsylvania would continue to come from wireline competitors such as CLECs, as well as from cable telephone providers, wireless service providers and Voice over Internet Protocol (VoIP) providers operating throughout the State. (OCA's brief at 27–28.)

**27.** The Arizona Commerce Commission's comments that Joint Applicant's evidence did not meet the legal standard for approving the merger without conditions are equally apropos to Joint Applicants' testimony presented to our Commission where it stated:

The Applicants' witnesses offered carefully parsed testimony to extol the virtues of the merger transaction, but failed to offer any concrete examples of how the vast majority of customers (*i.e.*, residential and small business) would realize any benefits whatsoever from the transaction. For example, in describing the alleged benefits and commitments associated with the merger, Verizon's witnesses employed vague terms such as [the merger] *"likely* will provide benefits to Arizona customers;" "there is *no change contemplated* with respect to the terms and conditions of service;" "[the merger transaction is] *not likely to significantly increase costs* charged to the Arizona jurisdiction;" "mass market customers ... *may benefit* from new Internet access services ...*"* [and] "advanced network facilities and products *may, over time, become accessible to mass market customers."*

The Applicants' witnesses were unable to identify any examples of specific benefits that would be realized by mass market customers as a result of the merger. The best that such customers apparently could expect is that the transaction "is not likely" to cause any significant harm, and there is a possibility that, someday, in the future, advanced services could be more accessible to such customers. We are not persuaded that the remote possibility of some long-term, unidentified future benefit for the majority of the customers affected by the merger transaction satisfies our obligation to determine whether the merger is in the public interest.

*In the Matter of Joint Notice of Intent by Verizon Communications, Inc. and MCI, Inc.*

As to the benefit from the merger by continuing "Verizon's long-standing corporate presence in Pennsylvania," in no way is that a benefit to the Pennsylvania public. Verizon, the successor to Bell of Pennsylvania, is the incumbent phone carrier with its lines and facilities in the public right-of-way of the Commonwealth, and it is going to have a corporate presence in Pennsylvania regardless of whether its merger is approved. Regarding wireless broadband services, Joint Applicants stated in their application, "American consumers and small businesses will benefit from the enhanced deployment of wireline and wireless broadband services that this transaction will promote." Again, there is nothing that quantified what enhanced deployment of wireless broadband services means—does it mean that it is going to be rolled out faster—at a higher speed—and, considering that MCI was not a factor in wireless service—whether the roll out of those services was going to be undertaken without the merger.[28]

As Vice Chairman Cawley precisely explained in his dissent:

> [T]he inescapable conclusion [is] that the Joint Applicants, Verizon and MCI, have not met their evidentiary burden to demonstrate that the proposed merger will result in 'affirmative benefits.' In contrast, a wide array of parties in this proceeding, including the [OCA] and the [OSBA], have persuasively demonstrated that the proposed merger will adversely affect not only the competitive structure and functions of the telecommunications services market in this Commonwealth, but residential and small commercial consumers of retail telecommunications services as well. Indeed, the record fails to establish that the merger will benefit any larger commercial or industrial consumer. In short, the merger will benefit the Joint Applicants but no one else.

(Vice Chairman Cawley's December 15, 2005 dissent at 1.)

Because we find that there was no evidence that the merger of Verizon and MCI in Pennsylvania would affirmatively promote the service, accommodation, convenience or safety of the public in some substantial way, the order of the Commission is reversed and we remand this matter to the Commission to either reject the merger or impose conditions that will benefit the public in a substantial way.

President Judge COLINS dissents.

### ORDER

AND NOW, this *20th* day of *February*, 2007, the order of the Pennsylvania Public Utility Commission, dated January 11,

---

on Behalf of its Regulated Subsidiaries, Az. C.C. docket Nos. T–01846B–05–0279, et al., 2005 WL 3739801 (December 9, 2005 at 15–16.) (Citations omitted, emphasis in original.)

**28.** Other state Public Utility Commissions found similar conditions to be illusory and that a merger would not be permitted unless conditions to make the merger was in the public interest. *See e.g., In the Matter of the Joint Application of Verizon Communications, Inc. and MCI, Inc. for approval of Agreement and Plan of Merger,* 2005 Wash. UTC LEXIS 655 (December 23, 2005); *VERIZON COMMUNICATIONS, INC. and MCI, INC. Request for Approval of Agreement of Verizon Communications and MCI, Inc.,* 2005 Me. PUC LEXIS 278 (December 22, 2005); *In the Matter of Joint Notice of Intent by Verizon Communications, Inc. and MCI, Inc. on Behalf of its Regulated Subsidiaries,* Az.C.C. docket Nos. T–01846B–05–0279, et al., 2005 WL 3739801 (December 9, 2005); *In the Matter of Joint Application of Verizon Communications, Inc. and MCI, Inc. to Transfer Control of MCI's California Utility Subsidiaries to Verizon Which Will Occur Indirectly as a Result of Verizon's Acquisition of MCI,* 2005 Cal. PUC LEXIS 517 (November 18, 2005).

2006, is reversed and remanded to the Commission to either reject the merger or impose conditions that will benefit the public in a substantial way.

Jurisdiction relinquished.