937 A.2d 1040

**Irwin A. POPOWSKY, Consumer Advocate, Appellee**

**v.**

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Appellant**

**Verizon Communications, Inc., Intervenor.**

Supreme Court of Pennsylvania.

Argued Oct. 16, 2007.

Decided Dec. 27, 2007.

Joseph Kevin Witmer, Bohdan R. Pankiw, Frank B. Wilmarth, PA Public Utilities Com'n, Harrisburg, for Public Utilities Com'n.

Joel Howard Cheskis, Darlene R. Wong, Philip F. McClelland, PA Office of Atty. Gen., for Irwin A. Popowsky.

Sharon Elizabeth Webb, William R. Lloyd, Jr., Somerset, Office of Small Business Advocate, for Office of Small Business Advocate, appellee amicus curiae.

Norman James Kennard, Kennard Law Offices, LLC, Harrisburg, for Pennsylvania Telephone Ass'n, appellee amicus curiae.

Lillian Smith Harris, William T. Hawke, Hawke McKeon & Sniscak, LLP, Harrisburg, for PECO Energy Co., UGI Utilities, Columbia Gas of PA, and PA–American Water, appellee amici curiae.

Richard P. Limburg, Thomas A. Long, Obermayer Rebmann Maxwell & Hippel, LLP, Philadelphia; Suzan DeBusk Paiva, New York City, Verizon Pennsylvania, Inc.; Barbara Anderson Miller, Kelley Drye & Warren, LLP, Washington, DC; William Bennett Petersen, New York City, Verizon Legal

Dept.; Leigh Hyer, New York City, Verizon; Scott H. Angstreich, Brendan J. Crimmins, Kellogg, Huber, Hansen, Todd, Evans & Figel, PLLC, pro hac vice, Washington, DC, for Verizon Communications, intervenor.

BEFORE: CAPPY, C.J., CASTILLE, SAYLOR, EAKIN, BAER, BALDWIN and FITZGERALD, JJ.

## *OPINION*

Justice SAYLOR.

Appeal was allowed to review the Commonwealth Court's decision overturning the Public Utility Commission's approval of the Verizon/MCI merger.

Pursuant to Pennsylvania's Public Utility Code, 66 Pa.C.S. §§ 101–3316, the Public Utility Commission (the "PUC" or the "Commission") is the Commonwealth administrative agency which regulates jurisdictional public utilities, including various telecommunications companies. Public utilities are obliged, under the Code, to obtain Commission approval for a proposed merger in the form of a certificate of public convenience. *See* 66 Pa.C.S. § 1102(a)(3); *see also* 59 Pa.Code § 69.901. The PUC is empowered to grant such a certificate only if it finds that it is "necessary or proper for the service, accommodation, convenience, or safety of the public." 66 Pa.C.S. § 1103(a). In addition, the Commission may impose such conditions in connection with the approval as it deems to be just and reasonable. *See id.*

Verizon Communications, Inc. and MCI, Inc., through their subsidiaries, provide regulated telecommunications services in Pennsylvania and elsewhere.[1] In February 2005, these companies executed an agreement and plan of merger whereby MCI would become a wholly-owned subsidiary of Verizon. The merger was driven primarily by Verizon's interest in

1. For example, Verizon is the largest incumbent local exchange carrier and MCI the leading competitive local exchange carrier in Pennsylvania. Additional information concerning both companies is developed in the Commonwealth Court's opinion, *see Popowsky v. PUC*, 917 A.2d 380, 383 nn. 2–3 (Pa.Cmwlth.2007) *(en banc)*, and below.

developing a network infrastructure to enhance its position in the enterprise market (composed of large end users, such as businesses, government entities, and large institutional customers such as universities), which MCI has targeted and in which it is especially strong. The decision also took into account the general, continuing declines in Verizon's wireline and in MCI's mass market businesses. *See generally Popowsky,* 917 A.2d at 383 ("The merger was prompted by the nationwide decline in Verizon's and MCI's core local and long distance services caused by regulatory changes, marketplace developments and changes due to technology and the two companies' belief that they could complement each other's weaknesses while improving growth.").

The companies applied for all necessary federal and state approvals, including reviews by the United States Department of Justice ("DOJ"), the Federal Communications Commission (the "FCC"), and a number of state commissions, including the PUC. The Pennsylvania proposal did not call for any specific change in rates, terms, or conditions for any telecommunications services. Federal approvals subsequently were obtained from DOJ, *see United States v. SBC Communications, Inc.,* 489 F.Supp.2d 1, 24 (D.D.C.2007),[2] and the FCC, *In re Verizon Communications, Inc. and MCI, Inc.,* 20 F.C.C.R. 18433 (November 17, 2005),[3] as were all necessary approvals from state regulatory bodies.

The Pennsylvania proceedings included more than thirty participants, including the Office of Consumer Advocate (the "OCA" or the "Consumer Advocate"), which filed a timely protest. The OCA's central position was that, under this Court's decision in *City of York v. PUC,* 449 Pa. 136, 295 A.2d

2. As further developed below, DOJ determined that certain commitments on the part of the merged companies were necessary to remedy asserted anticompetitive harms. DOJ entered into a consent decree with the joint applicants and, pursuant to federal antitrust law, filed a complaint in federal district court, together with stipulations and a proposed final judgment. Such judgment ultimately was entered by the district court in the above-cited case.

3. The FCC also attached conditions to its approval, as further developed below.

825 (1972), Pennsylvania law requires assurances that a proposed merger will provide substantial public benefit to support regulatory approval, and thus, Pennsylvania-specific conditions were necessary as a prerequisite to a certificate of public convenience. The OCA and others suggested various conditions, including: a five-year freeze on non-competitive services; provision of stand-alone, as opposed to bundled, digital subscriber line (or DSL) services; submission of a modernization plan to accelerate broadband deployment; and development of company-specific service quality measures.

An administrative law judge (the "ALJ") oversaw the development of an extensive evidentiary record. Testimony was received from various witnesses presented by the joint applicants in support of a conclusion that the merger would benefit the public. For example, one Verizon witness testified as follows:

> The public interest will be promoted by [the merger] with the creation of a strong new competitor for enterprise customers nationwide and here in Pennsylvania, new investment in communications infrastructure, and further development of an advanced broadband platform.
>
> * * *
>
> [T]he merger will deliver benefits to customers of all types in the form of competitive prices, network improvements, and the enhanced ability for customers to purchase all of their communications needs from a single supplier. Customers also will benefit from Verizon's investment in the maintenance and improvement of MCI networks and systems, including MCI's Internet Protocol ("IP")-based backbone.
>
> * * *
>
> [T]he transaction will greatly enhance the abilities that both Verizon and MCI now possess as stand-alone companies to provide a comprehensive suite of services to consumers, businesses and government customers.

R.R. at 20a–23a (Testimony of Paul B. Vasington, Director of State Public Policy for Verizon). By way of further example,

an MCI witness identified similar benefits while discussing the effects of the merger on competition, as follows:

> The merger will have a pro-competitive effect and will not cause competitive harm in Pennsylvania. In the enterprise market, MCI's and Verizon's networks, services, and areas of expertise are highly complementary and not overlapping. MCI is strong in the enterprise sector; Verizon is not. MCI operates a large Internet backbone network; Verizon does not. MCI has no wireless assets and offers no wireless services to enterprise customers; Verizon operates a large and successful wireless business. Thus, the combination will benefit customers by enabling the merged entity to operate at lower costs, to develop high-quality innovative services, and to deploy those services rapidly. It will bring Verizon, with all of its expertise and financial resources, into the Pennsylvania enterprise market, and the combined company will be able to offer a broader and more complete array of services than either Verizon or MCI is positioned to offer on its own. Moreover, the merged entity will not occupy a dominant position or otherwise be in any position to stifle growth in competition.

R.R. at 72a (testimony of Sally McMahon, Vice President—Consumer Affairs and Quality for MCI); *see also id.* at 75a (adding that the transaction "will promote domestic security by enhancing investment in the communications infrastructure that is used by the Department of Defense and Homeland Security, as well as other federal and state agencies, and ensuring that the crucial networks remain robust and technologically advanced"). A Verizon witness also explained that his company had failed to win a wide variety of bids for enterprise services due to its lack of broad-ranging, facilities-based network coverage which the combination with MCI will provide, benefiting the market by introducing additional pricing pressure and service choice to customers. *See* R.R. at 30a (Vasington).

The OCA presented contrary evidence, including the following testimony from a consulting economist specializing in public utility regulation:

If you look closely at how the companies characterize the alleged benefits of the proposed merger, they implicitly assume that a strengthening of Verizon's competitive position will somehow translate into public interest benefits. But, making a dominant carrier even more dominant isn't necessarily good for the public interest. Enabling Verizon to increase its market share or improve upon its already robust profits isn't self-evidently beneficial to the public, as would be an allegation that the merger will reduce concentration within the industry, make the industry more competitive, or intensify the competitive process. But, given Verizon's huge size and dominant position, there is no reason to accept the assumption that what is good for Verizon is good for its customers or the public in general. Simply stated, just because Verizon will be even bigger and stronger doesn't mean that the prospects for effective competition will improve, or that the public interest will be advanced.

\* \* \*

When viewed from a public interest perspective, there is no reason to assume that the public will benefit from greater efficiencies, reduced costs, increased innovation or improved quality, nor have they offered sufficient evidence to judge whether the anticipated gains in revenues will provide a substantial affirmative benefit to the public.

R.R. at 279a–281a (testimony of Ben Johnson, PhD). Along the same lines, another consultant specializing in telecommunications supporting the protests testified:

Verizon has provided no evidence to show that consumers will receive any substantial affirmative benefit—in terms of the quality of telephone service—from the merger. Verizon is careful *not* to say that consumers will benefit from this transaction, nor will the company offer any real assurance that the merger will improve the quality of service delivered to customers, particularly residential customers. Verizon's references to service quality are oblique, using terms like "maintaining" and "protecting," as if the company simply hopes that service will not deteriorate as a result of the

merger's cost-cutting plans and reductions in the number of employees.

R.R. at 333a–334a (testimony of Rowland L. Curry, P.E.). The OCA also contended that the level of merger savings enjoyed by the resultant companies (estimated at $644 million attributable to Pennsylvania) was significant, because the Commission often has required merging utilities to pass through at least a portion of such savings to customers as a condition to merger approval.

The administrative law judge credited most of the joint applicants' evidence and recommended approval of the merger and the award of a certificate of public convenience, subject only to the conditions imposed by DOJ and the FCC.[4] *See In re Verizon Communications, Inc.*, A–310580F009, *et. al.*, *slip op.*, 2006 WL 995853, at *53–*91 (Initial Decision by ALJ Charles E. Rainey, Jr. Nov. 15, 2005) (*"Initial Decision"*). Preliminarily, the ALJ enumerated the various assets and strengths that each of Verizon and MCI brought to the merger, including: MCI's solid base of large enterprise customers on a national and international basis; MCI's Internet Protocol ("IP") backbone and IP-related expertise; Verizon's robust local network in key regions of the country (serving twenty-eight states and the District of Columbia); its solid regional base of residential and small to medium sized business customers; and its strong wireless investment. *See id.*, 2006 WL 995853, at *60–*61. The ALJ found that a combined company with these assets and strengths will have the essen-

4. The DOJ conditions included partial divestiture of direct access capacity to certain buildings in a number of metropolitan areas, including Philadelphia, in which only Verizon and MCI have direct connections. *See* Verizon Communications, 489 F.Supp.2d at 6–7. The FCC conditions included voluntary commitments by the joint applicants that: for a period of two years (with limited exceptions), no Unbundled Network Element ("UNE") rate increases in state-approved rates; no increase for thirty months in rates for certain wholesale metro private line services provided in Verizon's local service areas; the offering of special access offerings to non-affiliated providers; and a thirty-month moratorium on increases for certain interstate tariff rates. *See* In re Verizon, 20 F.C.C.R. 18433, Appx. G; *see also* Popowsky, 917 A.2d at 384 n. 7 (summarizing the voluntary conditions within the FCC/Verizon accord).

tial infrastructure to offer innovative, high-speed data and video services via a fiber-optic network and to deploy mobile IP devices, permitting customer applications and data to be accessed from any location, free from the previous availability of access only from fixed workstations. *See id.,* 2006 WL 995853, at *61, *67. The ALJ also determined that the combined company would have the significant in-house expertise to overcome technical challenges to such mobile IP services. *See id.,* 2006 WL 995853, at *61. According to the ALJ, the combined company also would be in a strong financial position to invest in the existing IP network at a lower cost of capital than MCI could obtain on its own, with the result of increasing network capacity, extending network reach, and adding new capabilities to the network. In this regard, the ALJ highlighted that Verizon had committed to invest two billion dollars nationally to enhance MCI's network and information technology platforms. *See id.*

The ALJ further catalogued benefits to enterprise and government customers,[5] consumers,[6] investors,[7] and the American economy.[8] Although the ALJ recognized that the merger

---

**5.** These include: Verizon's ability to carry traffic over MCI's Internet backbone, improving efficiency and enhancing the ability to manage complex network assets and applications; Verizon's ability to use MCI's Internet Service Provider ("ISP") connectivity services (such as email, web hosting, Domain Name Server ("DNS") services, and other services), enhancing Verizon's capabilities in a market in which it is at present a modest provider; the creation of a new competitor that is capable of providing enterprise customers across the nation with a wide array of service, including wireless; and the production of a more efficient operating structure, allowing for faster and more robust network deployment. *See Initial Decision,* 2006 WL 995853, at *61–*62.

**6.** These include: deployment of a platform that can support a broad array of multimedia communications services and applications for all customers, and enhanced deployment of wireline and wireless broadband services. *See Initial Decision,* 2006 WL 995853, at *61–*62.

**7.** *See Initial Decision,* 2006 WL 995853, at *62 ("Investors from both companies will receive benefits from the merger as the transaction is expected to eliminate duplicative expenses and create operational efficiencies, thus enabling additional investment and deployment of new services for all customers.").

**8.** Such benefits are: the creation of a global industry leader by strengthening America's premier telecommunications network builder (MCI) and its leading service provider (Verizon); the enhancement of

was expected to lead to some reduction in the work force, he found that the combined company would be better able to maintain higher levels of overall employment into the future than either company would have been able to do on its own. *See Initial Decision,* 2006 WL 995853, at *62.

In terms of competition, the ALJ determined that, after the merger is completed, competition for residential and small business customers in Pennsylvania would continue to ensue from wireline competitors (such as competitive local exchange carriers), cable telephone providers, wireless service providers (which the ALJ explained are rapidly displacing traditional wireline services), and Voice Over Internet Protocol ("VoIP") providers operating throughout the Commonwealth. *See Initial Decision,* 2006 WL 995853, at *62. Additionally, the ALJ found that numerous companies provide vigorous competition in the servicing of enterprise customers, both in Pennsylvania and across the country, and that Verizon and MCI themselves rarely compete directly in such market. *See id.,* 2006 WL 995853, at *63.

Based on the above, the ALJ concluded:

Evidence of record in this proceeding establishes that the merger of Verizon and MCI will create a financially and technologically strong company capable of providing advanced telecommunications and information services that will enhance the quality of life of customers in all market sectors. The United States Department of Justice Antitrust Division (DOJ) and the Federal Communications Commission (FCC) have also thoroughly investigated the merger and have imposed conditions to ameliorate the anticompetitive effects of the merger. The evidence presented in the case before me supports approving the merger because it will provide substantial public benefits. No additional conditions beyond those imposed by the DOJ and FCC are necessary.

Verizon's ability to lead the telecommunications industry's revitalization through new investment; and the assurance that key domestic communications networks are robust and technologically advanced. *See Initial Decision,* 2006 WL 995853, at *62.

*Initial Decision,* 2006 WL 995853, at *65. Although the ALJ understood that a merger of Verizon and MCI primarily would benefit enterprise customers in the short term, *see id.,* 2006 WL 995853, at *61, *66, he also reiterated that mass market customers would profit as well from receipt of secondary benefits of the merged company's efforts to better serve enterprise customers, such as better services from those entities and direct enhancements offered to consumers to achieve economies of scale. *See id.,* 2006 WL 995853, at *67 (citing R.R. 38a–39a (Verizon Statement)). Supporting his conclusion that there was no anticompetitive effect of the merger on the conditions approved by DOJ and the FCC, the ALJ developed that one of the DOJ conditions was a requirement for partial divestiture of wireline connections to certain buildings in Philadelphia. *See id.; see also supra* note 4. The ALJ also indicated that "record evidence provides that the merger of Verizon and MCI will have little or no adverse impact on the competitive choices available to enterprise customers, other than what DOJ found," and, because MCI is not competing for mass market customers, "the merger will not eliminate a significant competitor for mass market customers." *See Initial Decision,* 2006 WL 995853, at *69. In answer to the OCA's argument that the merger would create a competitor which was excessively strong and dominant, the ALJ concluded:

> [T]here is no evidence of record that either existing wireline companies or intermodal telecommunications companies such as wireless, cable and satellite, would be driven from the market if Verizon and MCI were to merge. As Joint Applicant witness Dr. Taylor testified, numerous companies compete against Verizon to serve small, medium size and larger enterprise customers, both in Pennsylvania and across the country.... There is no evidence that these or any other telecommunications providers ... will be forced out of the market as a result of Verizon and MCI.

* * *

For all the foregoing reasons, I do not find that there is evidence of record in this proceeding that supports going

beyond the divesture required by the DOJ in its Final Judgment, which the FCC also found adequate to remove the anticompetitive effects of the merger.

*Id.*, 2006 WL 995853, at \*70. Indeed, the ALJ noted that both federal agencies had indicated that the merger will likely benefit consumers. *See, e.g., id.*, 2006 WL 995853, at \*68.

Finally, the ALJ reviewed each condition advanced by participants challenging the transaction and reiterated his conclusion that no additional conditions were necessary to render the merger consistent with the public interest in Pennsylvania. *See Initial Decision*, 2006 WL 995853, at \*70–\*90.

In response to exceptions filed by the OCA and others, the Commission analyzed the findings of the ALJ and the corresponding objections, reviewed the record, found that the merger will affirmatively benefit the public, and approved the merger with no conditions beyond those imposed by the FCC and DOJ. *See In re Verizon Communications, Inc.,* A–310580F0009, *et al., slip op.,* 2006 WL 995853 (Pa.P.U.C. Jan. 11, 2006).

The Commission indicated that, in light of considerations related to market concentration, it was required to consider the competitive impacts of the merger as part of the broader public interest analysis. *See In re Verizon,* 2006 WL 995853, at \*14. In line with the ALJ's Initial Decision, the PUC found that the merger did not substantially impact competition in the mass market in Pennsylvania due to MCI's limited ability to constrain Verizon and the availability of competitive alternatives. *See id.*, 2006 WL 995853, at \*15. Further, the Commission evaluated the application of an analytical index that measures market concentration resulting from mergers and determined that modification to the indicator was appropriate in light of market realities pertaining to the telecommunications industry in Pennsylvania. *See id.*, 2006 WL 995853, at \*41–\*43. Specifically, the Commission reasoned that the relevant product market should be broadened to encompass emerging bundled telecommunications services that have arisen as viable alternatives to Verizon's wireline service and

constrain its ability to exercise market power as a result of the merger. *See id.*, 2006 WL 995853, at *43. In terms of the enterprise market, the Commission's decision incorporated the ALJ's finding that numerous companies compete against Verizon to service small, medium-sized, and large customers.[9] Correspondingly, the Commission also reiterated the ALJ's determination that the market realities are such that the communications industry has technology-enhanced substitutes available.

Reviewing the DOJ and FCC approvals, the PUC observed that, consistent with federal mandates, the agencies also had analyzed public interest implications, including competitive effects. Specifically, the Commission highlighted that DOJ had addressed potential anticompetitive harm by requiring remedial concessions,[10] and the FCC also had imposed conditions initially reflected in voluntary commitments and concluded that Verizon's and MCI's agreements adequately addressed concerns regarding competition and market power and bolstered the public interest in support of merger approval. *See In re Verizon*, 2006 WL 995853, at *6. Based on all of the above considerations, the Commission determined that additional Pennsylvania-specific conditions were not necessary to mitigate anticompetitive harm. Notably, the Commission ex-

---

**9.** The ALJ had named "traditional [interexchange carriers] such as AT & T, Sprint and Qwest; [competitive local exchange carriers] like XO and Level 3; cable companies such as Time Warner and Cablevision; system integrators and managed service providers like IBM, EDS, Accenture, Northrop Grumman, and Lockheed Martin, major global telecommunications providers such as Equant, British Telecom, Deutsche Telekom, COLT, KPN Telecom, and NTT; equipment vendors like Lucent and Nortel; and major application providers such as Microsoft." *See Initial Decision*, 2006 WL 995853, at *63.

**10.** Relative to DOJ's approval, the Commission explained that the federal agency was concerned that, absent some divestiture of assets (in the form of rights of use for direct connections to certain buildings in metropolitan areas), the merger would reduce the number of carriers owning or controlling a proximate connection to those affected buildings from two to one, thus effectively eliminating competition in the provision of special access services. *See In re Verizon*, 2006 WL 995853, at *7. The Commission noted that Philadelphia is the only metropolitan area in Pennsylvania in which such divesture was implicated. *See id.*

pressly indicated that its decision in this regard was "[b]ased on our review of the Pennsylvania-specific record[.]" *Id.*, 2006 WL 995853, at *41.

In terms of the broader assessment of public benefit, the Commission reiterated the complementary strengths brought by the joint applicants to the merger; noted the companies' limited presence in each others' markets; and accepted the litany of resultant advantages found by the ALJ. *See In re Verizon*, 2006 WL 995853, at *17; *see also supra* notes 5–8 and accompanying text. The PUC also observed that the FCC found similar public benefits, stressing the federal agency's determination that "the merger enhances national security by providing additional security, routing efficiency, and greater redundancy for vital and sensitive government communications." *Id.*, 2006 WL 995853, at *6. In response to the OCA's request for a price freeze or cap, the Commission expressed concern that such an approach might be counterproductive to the interests of the mass market in an increasingly competitive telecommunications environment. *See id.*, 2006 WL 995853, at *20. The PUC concluded that the better approach, consistent with that of the FCC, was to permit infrastructure enhancements, investment, research, and development to promote a competitive environment, from which mass market customers will benefit via the array of telecommunications and multi-media applications, as well as the deployment of additional wireline and wireless broadband services resulting from the merger. *See id.*, 2006 WL 995853, at *21. Moreover, the Commission indicated that a rate cap would send improper cost signals and was not advisable on the record presented. *See id.* The Commission also indicated that the resultant company's ability to raise rates already is constrained by regulatory controls, which provided a sufficient statutory safeguard against undue rate increases. *See id.*

Finally, tracking the Initial Decision, the Commission analyzed and rejected the many objections and additional proposed conditions raised in the proceedings, frequently based on lack of necessity (or, stated otherwise, the finding of substantial public benefit in their absence) and/or negative

impact of the requested conditions. *See In re Verizon,* 2006 WL 995853, at *22–*41. As the ALJ recommended, the award of a certificate of public convenience expressly was made conditional upon the merged companies' compliance with the federally-imposed conditions. *See id.,* 2006 WL 995853, at *43.

Vice Chairman James H. Cawley dissented on the belief that the evidence showed that the only parties which would benefit from the merger were Verizon and MCI. *See In re Verizon,* 2006 WL 995853, at *44–*52 (Cawley, V.C., dissenting). In his view, absent additional conditions, the proposed merger would adversely affect the competitive structure and functions of the telecommunications services market in Pennsylvania, as well as the residential and small commercial consumers of retail telecommunications services. Therefore, the dissent would have required the merged company to utilize a portion of its cost savings to address Pennsylvania-specific service quality issues and to accelerate the universal availability of broadband services. *See id.,* 2006 WL 995853, at *52.[11]

The OCA filed a petition for review in the Commonwealth Court, which reversed in a divided opinion and remanded the matter to the PUC for the imposition of conditions or rejection of the merger. *See Popowsky,* 917 A.2d at 396–97. Like the Commission dissent, the Commonwealth Court majority found that the joint applicants failed to meet the *City of York* standard. *See id.* at 396 ("[W]e find that there was no evidence that the merger of Verizon and MCI in Pennsylvania would affirmatively promote the service, accommodation, convenience or safety of the public in some substantial way[.]").

11. The Commission majority had rejected conditions relating to service quality assurance since the record demonstrated that the joint applicants were not providing service below required levels, and the corporate consolidation would likely improve service quality. *See In re Verizon,* 2006 WL 995853, at *12 (adopting *Initial Decision,* 2006 WL 995853, at *64) *31. The Commission overruled exceptions calling for acceleration of broadband deployment on the ground that Verizon had exceeded its commitment to provide such services in the rural, suburban, and urban exchanges that it served. *See id.,* 2006 WL 995853, at *25.

The majority explained that previously, under traditional cost-based rate regulation, financial savings gained on account of a merger would be passed on to consumers through lower rates. *See id.* at 393. However, in light of statutory changes replacing the traditional framework with a new scheme of price-cap regulation, *see* 66 Pa.C.S. §§ 3001–3019, the majority explained that rates for telecommunications utilities are presently governed by an inflation-based formula that gives no account for decreased costs. *See Popowsky,* 917 A.2d at 394. As a result, the Commonwealth Court majority expressed a concern that none of the substantial synergy savings resulting from the Verizon/MCI merger would flow through to consumers. It further reasoned that this dynamic increased the importance of examining the anticompetitive effects of the merger. *See id.*

With this background, the Commonwealth Court majority criticized the Commission for failing to undertake a Pennsylvania-specific analysis of the anticompetitive effects of the merger, reading the Commission's decision as merely relying on the nationally-based assessments of DOJ and the FCC. *See Popowsky,* 917 A.2d at 394. For this reason alone, the majority indicated that a remand was warranted. Further, the majority regarded the Commission's decision as identifying only three positive benefits flowing to the public: the ability of the companies' combined network to support creation of a platform to provide a broad array of multimedia communications services and applications; the promotion of wireline and wireless broadband services; and the continuing of Verizon's longstanding corporate presence in Pennsylvania.[12] The majority reasoned that these benefits were illusory, however, as it found no supporting detail in the record concerning what particular multimedia services were to be provided and no evidence that any of the asserted advantages would not exist in the absence of the merger. *See id.* at 395–96. Finally, the majority referenced decisions from other states as supportive

12. The Commonwealth Court majority opinion includes a footnote listing a number of the additional benefits found by the ALJ and the Commission, *see Popowsky,* 917 A.2d at 395, but the majority did not undertake a developed assessment of those benefits in its opinion.

of its conclusion that further conditions were necessary to ensure that the merger resulted in value favorable to the public. *See id.* at 396 n. 28 (citing public utility decisions from Washington, Maine, Arizona and California).

President Judge Colins dissented without opinion.

In the present discretionary appeals by the Commission and Verizon ("Appellants"), they argue that the OCA mischaracterizes, and the Commonwealth Court misapplied, *City of York*. In particular, Appellants contend that the agency's and court's construction of *City of York* as requiring absolute assurance of public benefit to support merger approval is inconsistent with the preponderance of the evidence standard of proof applicable to PUC findings. *See generally V.J.R. Bar Corp. v. PLCB*, 480 Pa. 322, 326, 390 A.2d 163, 165 (1978) (explaining that the preponderance standard is the prevailing standard of proof governing agency findings in most administrative proceedings). Verizon, in particular, emphasizes that this framework for the necessary regulatory review is no different from that pertaining to the FCC's evaluation, *see In re Verizon*, 20 F.C.C.R. at 18443 ("The Applicants bear the burden of proving, by a preponderance of the evidence, that the proposed transaction, on balance, serves the public interest."), which resulted in the federal agency's approval of the Verizon/MCI merger. Further, Appellants argue that nothing in Section 1103 or *City of York* requires that the essential public benefits must necessarily arise in the short term.[13] Indeed, Appellants develop that *City of York* credited several longer-term benefits in the evaluation. *See City of York*, 449 Pa. at 142–43, 295 A.2d at 828–29 (affirming the approval of a merger of several Pennsylvania telecommunications providers based on substantial evidence that the merger would, *inter alia*, result in a stronger company, improve access to capital

---

13. *See, e.g.*, Brief for Appellant at 23–24 ("Notably, there was no requirement [in *City of York*] that the merged company make special concessions or rate reductions as a *quid pro quo* for regulatory approval."); *id.* at 36 ("Compliance with *City of York* does not transform the Commission's discretionary authority on conditions into a mandate to extract short-term rate concessions to the exclusion of any consideration of a longer-term approach to public benefit.").

markets, provide comparative advantages, not adversely affect rates, and produce operating economies). The Commission vigorously defends the validity of a longer-term approach to public benefit in the present price-cap regulatory environment.[11] The PUC also stresses that short-term rate concessions may in fact impede public benefit by forestalling the deployment of an advanced network to provide multimedia services, a capital-intensive undertaking and a concern which the Commission expressly related to the Verizon/MCI merger in its opinion.

Appellants recognize that the PUC's benefits assessment, unlike that of the FCC, is Pennsylvania-specific. They explain, however, that the extensive evidentiary record was developed with this perspective in mind, and the Commission's essential findings were properly focused upon the merger's effects in the Commonwealth. In particular, Appellants challenge the Commonwealth Court's conclusion that the Commission failed to conduct a Pennsylvania-specific analysis of the impact of the merger on competition, given that the Commission set forth its evaluation in this regard at considerable length.

More generally, Appellants assert that the intermediate appellate court distorted the nature and scope of the PUC's merger analysis by overlooking substantial evidence of record supporting the Commission's finding of public benefit and improperly reweighing the evidence that the court did recognize. The briefs of both Appellants contain a detailed treatment of the evidence including that which is summarized above, which Appellants urge amply supports the Commission's finding of substantial public benefit flowing from the merger.

The OCA, on the other hand, defends the Commonwealth Court's central conclusion that the record contains no evidence

14. *See, e.g.,* Brief for Appellant at 38 ("Even if the OCA and the Commonwealth Court supposed that the GA's price-cap regulation contains some alleged defect on merger savings, this does [not] mean that the Commission has a mandate to rewrite Section 1103(a) of the Public Utility Code or develop a new *City of York* standard.").

of public benefit from the merger. It is the Consumer Advocate's position that, to validly find that benefits will accrue, the PUC must determine that there are legally binding commitments in place to "ensure" them. *See, e.g.,* Brief for Appellee at 51 ("It is the overall public interest in Pennsylvania that must be served through the *assurance* of some substantial public benefits." (emphasis added)). In this regard, the OCA stresses that, in deciding the *City of York* case, this Court used the word "will" when discussing the need for substantial affirmative public benefits. *See City of York,* 449 Pa. at 141, 295 A.2d at 828 (stating that the Public Utility Code "requires that the proponents of a merger demonstrate that the merger *will* affirmatively promote the 'service, accommodation, convenience, or safety of the public' in some substantial way.").[15] Thus, the OCA asserts that, as a matter of law, in the absence of specific conditions, the types of merger benefits that would have accrued under the former cost-based ratemaking methodology (which would have required rate reductions in recognition of synergy savings), such as economies of scale and other cost reductions, cannot be found to be substantial affirmative public benefits under the current inflation-based, price-cap ratemaking methodology (which does not require attendant rate reductions), in the absence of mandatory conditions.

The OCA also develops that, in a number of prior cases, the Commission has ensured that mergers will affirmatively promote public benefits by conditioning its approval on, for example, rate reductions, rate caps, addition of new services, and/or improvements to the Pennsylvania network infrastructure.[16] The Consumer Advocate does not insist on rate reduc-

---

15. The OCA also points to the Legislature's use of the term "shall" in Section 1103(a), 66 Pa.C.S. § 1103(a) ("A certificate of public convenience shall be granted by order of the commission, *only* if the commission *shall* find or determine that the granting of such certificate is necessary or proper for the service, accommodation, convenience, or safety of the public." (emphasis added)).

16. In this regard, the OCA furnishes the following references:

 *ARIPPA v. PUC,* 792 A.2d 636 (Pa.Cmwlth.2002) (explaining that "one condition is the merged company must flow merger-related savings through to ratepayers by an extension of the transmission and distribution rate caps from December 31, 2004 to December 31, 2007");

tions *per se,* but rather, suggests that some other set of conditions proposed by the various participants in the regulatory proceedings might also ensure that the required benefits actually accrue.

As to the Commission's adoption of the conditions imposed by DOJ and the FCC, the OCA characterizes this act as meaningless, since the resultant company already was required to comply with those conditions under the terms of the federal approvals. Further, the OCA suggests that the Commission improperly employed the federal conditions to absolve itself of its responsibility to assure the accrual of public benefits in Pennsylvania.

Alternatively, the Consumer Advocate contends that the asserted benefits relied upon by the Commission are not substantial. By way of example, the OCA reiterates the position of Commonwealth Court majority and the Commission dissent that Verizon's claim of network enhancement was too vague to constitute evidence of affirmative benefit, since the joint applicants do not explain what multimedia services will be offered by the merged company, make a commitment to offer those services, or state that those services would not be offered in the absence of the merger. Similarly, while the OCA recognizes Verizon's commitment to invest at least two billion dollars nationally in MCI's network after the merger, it highlights that there is no evidence that such investment will be spent in Pennsylvania. The OCA develops that, in discov-

In *re Bell Atlantic,* 93 Pa. PUC 395, 1999 WL 1565855, 1999 Pa. PUC Lexis 86 (Nov. 4, 1999) (requiring Bell Atlantic, Verizon's predecessor, as a part of its merger with GTE Corp. to, among other things, "extend the cap on its rates for basic local exchange telephone services until December 31, 2003" and that Bell continue to "invest in Pennsylvania over the years 2000 through 2002 based on previous investment levels"); *Joint Application of DQE, Inc., Allegheny Power System, Inc. and AYP Sub, Inc., for Approval of the Transfer by Merger of the Property and Rights of Duquesne Light Company to Allegheny Power System, Inc.,* Pa. P.U.C. Docket Nos. A–110150F0015, *et al.,* 1998 Pa. PUC Lexis 48 ("Duquesne Light commits to decrease its distribution rate cap by $25 million annually;" "West Penn will share 50/50 with ratepayers any earnings achieved in excess of its currently authorized return on equity of 11.5%").
Brief for Appellee at 35.

ery, Verizon indicated that it could not yet specify locations for capital investments or allocate merger savings to specific venues.

Finally, the OCA does not agree or disagree with the Commonwealth Court's indication that the Commission failed to conduct a Pennsylvania-specific analysis of the competitive effects of the merger. Rather, it simply contends that the Commission's finding of no anticompetitive harm amounts to nothing more than a "do no harm" standard that was abandoned in *City of York*, in favor of the requirement of public benefit. *See City of York*, 449 Pa. at 141, 295 A.2d at 828 (overruling *Northern Pa. Power Co. v. PUC*, 333 Pa. 265, 5 A.2d 133 (1939)).

Generally, appellate review of a PUC order is limited to determining whether a constitutional violation, an error of law, or a violation of procedure has occurred and whether the necessary findings of fact are supported by substantial evidence. *See* 2 Pa.C.S. § 704; *Popowsky v. PUC*, 589 Pa. 605, 622, 910 A.2d 38, 48 (2006). Appellants' argument that neither Section 1103 nor *City of York* requires legally binding assurances of public benefit raises a question of law, over which our review is plenary. The substantial evidence facet of the above review standard is also implicated by the OCA's argument, and the Commonwealth Court's holding, that the Commission's finding of public benefit lacks adequate support in the record. Substantial evidence has been defined as the amount of relevant evidence which a reasonable person would accept as adequate to support a determination. *See Harmon v. Mifflin County Sch. Dist.*, 552 Pa. 92, 97–98, 713 A.2d 620, 623 (1998). We also bear in mind that, on account of the Commission's expertise in the utility arena, reviewing courts accord considerable deference to the agency concerning the certification process.[17]

---

**17.** *See, e.g., Popowsky,* 550 Pa. at 462, 706 A.2d at 1203 (explaining that the PUC's interpretation of Section 1103(a) "is entitled to great deference and will not be reversed unless clearly erroneous."); *see also Chester Water Authority v. PUC,* 581 Pa. 640, 652–653, 868 A.2d 384, 392 (2005); *Elite Indus., Inc. v. PUC,* 574 Pa. 476, 484, 832 A.2d 428,

The *City of York* decision is pivotal to the resolution of the legal question involved. As developed by the Consumer Advocate, there, this Court overruled previous precedent that required regulatory approval of a merger unless it was established that the transaction would adversely affect the public. *See City of York*, 449 Pa. at 141, 295 A.2d at 828. In doing so, the Court relied upon the plain language of Section 1103(a)'s predecessor, which it determined "requires that the proponents of a merger demonstrate that the merger will affirmatively promote the 'service, accommodation, convenience, or safety of the public' in some substantial way." *Id.* at 141, 295 A.2d at 828. Although the Court thus altered the standard by which regulatory approval is determined, it nevertheless affirmed the Commission's award of a certificate of public convenience authorizing the corporate consolidation of three telephone companies, on the ground that the Commission's order contained an express finding that the proposed merger would affirmatively benefit the public. *See id.* at 142, 295 A.2d at 828.

In developing its reasoning, the *City of York* Court explained that the Commission's finding of benefit was "fully supported by the record" by reference to the Commission's and the Commonwealth Court's treatment of the evidence, as follows:

> [T]he Commission has given considerable thought to the positive aspects of this merger. The benefits that will ultimately accrue to the subscribers of the [relevant] service area should not be given casual recognition. In view of the greater bargaining position that the surviving company . . . would have in obtaining needed capital in the money markets, and other comparative advantages, such as lower administrative costs, improved labor market conditions, and

432 (2003) (admonishing that the decision whether to issue a certificate of public convenience "falls squarely within the PUC's area of expertise and is best left to the commission's discretion"); *Philadelphia Suburban Water Co. v. PUC*, 425 Pa. 501, 512, 229 A.2d 748, 754 (1967) ("Neither this Court nor the [intermediate appellate court] . . . was intended by the Legislature to weigh the various factors entering in the granting of a certificate of public convenience and necessity by the Commission[.]").

more importantly, the elimination of the other two corporate companies . . ., the beneficiaries of this merger will certainly be the subscribers[.]

\* \* \*

[A vice president and director of all three companies] . . . testified that the merger would have no adverse effect on the customers of [any of the three companies], but rather there would be benefits to the customers. He testified that the merger would result in a stronger company; that investors will more likely be attracted to a larger company; that service will be improved; that some paper work and overlapping administrative details in connection with the three companies would be eliminated; that business relations with other businesses and government agencies would be simplified. Further, he testified that the merger would be helpful in regard to labor relations and would be beneficial in the administration of tariffs, employee relations, saving of executive time and in producing economies in insurance costs. His testimony could be fairly summarized as a persuasive assertion that the merger will produce operating economies and regulatory simplification that should benefit all parties.

*City of York*, 449 Pa. at 142, 295 A.2d at 828–29.

Additionally, *City of York* rejected the merger opponents' argument that the Commission erroneously refused to consider the potential effect of the proposed merger upon utility rates. According to the Court, the PUC had not flatly refused to consider rates; rather, it merely found that the merger opponents had produced no evidence that the merger would have any detrimental effect on rates. *See City of York*, 449 Pa. at 136, 295 A.2d at 829. Further, the Court reasoned that the Commission's finding that the merger would result in considerable economies could only be taken as an indication of the Commission's belief that the merger would have a beneficial effect upon rates. *See id.* Upon this review, *City of York* instructed that the Commission should consider, "at least in a general fashion," the effect that a proposed merger is likely to have on future rates charged to consumers. *See id.*

 As reflected in the above, *City of York* does not support the requirement advanced by the OCA, and implicit in the Commonwealth Court's decision, that the Commission must secure legally binding commitments to assure public benefit from a merger. Rather, as Appellants argue, *City of York* merely credited the Commission's preponderance-based finding of public benefit grounded upon the testimony of an industry professional and references to the Commission's judgment. *See generally V.J.R. Bar Corp. v. PLCB*, 480 Pa. 322, 326, 390 A.2d 163, 165 (1978) (explaining that the preponderance standard is the prevailing standard of proof governing the outcome in most administrative proceedings).[18] Further, we do not read the decision as inextricably tied to the then-

18. We agree with Verizon, in particular, that much of the conceptual difficulties with this case are resolved upon recognition that the Commission generally determines factual matters by a preponderance of the evidence. This Court has characterized a preponderance of the evidence as tantamount to a "more likely than not" inquiry, *see Commonwealth v. $6,425 Seized From Esquilin*, 583 Pa. 544, 555, 880 A.2d 523, 529 (2005); thus, the PUC was not required to ensure beyond all doubt that the noted public benefits would accrue. Rather, it was required only to apply the ordinary civil standard of proof to make a factually-based finding, a routine matter for administrative bodies.

We also note that, while there may be no legally binding assurance of public benefit from the Verizon/MCI merger, there is similarly no assurance of synergy savings arising from the transaction, given that unforeseen contingencies such as increased costs or technological obsolescence can affect savings forecasts just as they may the benefits evaluations. Thus, the Commission's findings concerning prospective merger savings, like the findings of prospective benefit, are also something that has been anticipated and found to be likely to occur as a factual matter on a developed record. Notably, other regulatory bodies regularly, appropriately, and necessarily rely upon probabilities in assessing the future effects of proposed mergers. *See, e.g., In re Verizon*, 20 F.C.C.R. at 18537 ("We find that the public interest benefits are *likely* to result from the proposed transaction and that, in light of the DOJ consent decree, the merger is not *likely* to have anticompetitive effects in any relevant markets." (emphasis added)). Moreover, given the role of regulatory expertise in making such assessments, other jurisdictions have recognized the appropriateness of affording deference to expert administrative tribunals concerning their informed judgments on similar matters. *See, e.g., Constellation Energy Commodities Group, Inc. v. FERC*, 372 U.S.App.D.C. 368, 457 F.3d 14, 24 (C.A.D.C. 2006) ("[A]s we have long recognized, it is within the scope of the agency's expertise to make ... a prediction about the market it regulates, and a reasonable prediction deserves our deference.").

prevailing scheme of cost-based rate regulation pertaining to telephone companies. Rather, as noted, the decision on its face merely requires consideration of rates "at least in a general fashion," or the "probable general effect of the merger upon rates," *City of York,* 449 Pa. at 143–44, 295 A.2d at 829, as a component of a net benefits assessment. Thus, we agree with Appellants that *City of York* does not hold that a merger benefits the public *only* if the PUC can demonstrate that the merger savings will lower prices to consumers. For similar reasons, the Commission is also correct in its prevailing interpretation rejecting the contention that "that the *City of York* test cannot be met without quantifying the specific effects of alleged savings." *In re Pennsylvania–American Water Co.,* 221 P.U.R. 4th 487, 494 (2002) (citation omitted).[19]

■ We also differ with the OCA's suggestion that the PUC's analysis of the effect of the Verizon/MCI merger on competition is immaterial to its assessment of public benefit. In line with the DOJ and FCC assessments, competitive impact is a substantial component of a rational net public benefits evaluation in the merger context. That the ultimate determination may be that the impact is modest, minimal, or non-existent does not negate the necessity of undertaking the examination in the first instance or remove the factor from the weighing and balancing process. Significantly, in terms of the net public benefits arising out of corporate consolidation, anticompetitive effects may offset or negate advantages and result in a denial of regulatory approval. Indeed, it is for this

19. Other regulatory bodies have no difficulty conducting a public interest analysis on similar terms. *See, e.g., In re Verizon,* 20 F.C.C.R. at 18536 ("In summary, we find that the proposed transaction is likely to generate several significant public interest benefits, *although it is difficult to quantify precisely the magnitude of some of these benefits.*" (emphasis added)).

Notably, the Consumer Advocate has not pursued challenges to the admissibility of the underlying evidence based on inadequacy of foundation such as a lack of sufficient qualifications on the part of any witness. Rather, the OCA focuses on its contention that testimony explicitly describing particular benefits predicted to result from the Verizon/MCI merger, even if accepted, is legally insufficient to support a Commission finding that such benefits will actually accrue, a proposition which is disapproved in our reasoning above.

very reason that large merger transactions are so highly regulated. Thus, in the present case, it is clear that the Commission's satisfaction that competition will not be impaired was a legitimate and significant factor in the overall certification inquiry.[20]

■■ In summary, as indicated in *City of York*, the appropriate legal framework requires a reviewing court to determine whether substantial evidence supports the Commission's finding that a merger will affirmatively promote the service, accommodation, convenience, or safety of the public in some substantial way. In conducting the underlying inquiry, the Commission is not required to secure legally binding commitments or to quantify benefits where this may be impractical, burdensome, or impossible; rather, the PUC properly applies a preponderance of the evidence standard to make factually-based determinations (including predictive ones informed by expert judgment) concerning certification matters.[21]

**20.** We also disagree with the Commonwealth Court's comment indicating that the Commission did not conduct a Pennsylvania-specific evaluation of the competitive effect of the merger. The court's understanding was apparently grounded on a passage of the PUC's opinion stating that the ALJ had been persuaded that a Pennsylvania-specific analysis was "not appropriate" in light of the DOJ consent decree. *See In re Verizon*, 2006 WL 995853, at *16. However, the Commission's decision otherwise makes it clear that its evaluation was centered on impact within the Commonwealth. In this regard, in the same passage of its opinion, the Commission explained that the DOJ and FCC approvals were "instructive" but "not conclusive on this Commission." *Id.* Furthermore, the Commission proceeded with a developed analysis of the merger's likely competitive effect "in the Commonwealth," which it indicated was "[b]ased on our review of the Pennsylvania-specific record," and which was grounded in actual citations to the record. *See id.*, 2006 WL 995853, at *41–*43; *see also id.* at *16; R.R. at 132a–186a (reflecting an extensive passage from the written testimony of William E. Taylor, PhD, captioned "The Transaction Will Not Harm Competition for any Customers in Pennsylvania"). As the Commission and Verizon argue at length, the PUC in fact reviewed extensive and detailed evidence on competition in Pennsylvania, made explicit findings of fact based on that evidence, and concluded that, with the DOJ consent decree and the conditions that the FCC imposed, the merger would not adversely affect competition in Pennsylvania and would benefit all types of consumers.

**21.** Parenthetically, while in some circumstances conditions may be necessary to satisfy the Commission that public benefit sufficient to

■ The second overarching question presented is whether the Commission's determination concerning public benefit is supported by substantial evidence. In this regard, as well, we differ with the Commonwealth Court's conclusion that there is "no evidence" of benefit inuring to the public as a result of the Verizon/MCI merger. As developed above and in the Commission's opinion, the ALJ's Initial Decision, and Appellants' briefs, the record is replete with evidence of public benefit along very similar lines to that which prevailed in the *City of York* decision. The Commonwealth Court discounted much of that evidence on the grounds that the joint applicants failed to develop in sufficient detail what particular multimedia services were to be produced by the corporate combination and offered no evidence that any of the asserted benefits would not exist in the absence of the merger. *See Popowsky*, 917 A.2d at 396. With regard to the former rationale, it is true that Appellants did not name particular services and/or products that have yet to be realized. However, they did describe their underlying objectives in these regards, as well as the means by which they are to be achieved, in sufficient detail to warrant the credence given by the PUC. Indeed, even from a lay perspective, bearing in mind today's technological advances affecting all segments of business and personal life, there is much force to the Commission's conclusion that a combination of Verizon's and MCI's assets and strengths has substantial potential to create an integrated infrastructure supporting delivery of innovative, high-speed data and video services via the fiber-optic network, as well as deployment of mobile devices freeing workers from fixed workstations. *See Initial Decision*, 2006 WL 995853, at \*61, \*67.[22] For similar reasons, the Common-

meet the requirement of Section 1103(a) will ensue, even where the PUC finds benefit in the first instance, Section 1103(a) also confers discretion upon the agency to impose conditions which it deems to be just and reasonable. *See* 66 Pa.C.S. § 1103(a).

22. Verizon also explains that the joint applicants could not have provided more definite statements concerning future plans during the proceedings before the Commission, because federal law prohibited it from engaging in post-transaction planning with MCI. *See* 15 U.S.C. § 18a (requiring merging entities to notify the Federal Trade Commission and DOJ and to observe a waiting period while those agencies review the

wealth Court's indication that the Appellants failed to establish that the merger was a necessary prerequisite to the accrual of the relied-upon benefits is facially lacking in merit. Again, the sum and substance of the credited joint applicants' evidence was that the bulk of the benefits would flow from the combination of MCI's Internet network infrastructure with Verizon's facilities and financial resources, an eventuality which simply would not occur absent the corporate transaction.[23]

Certainly, the OCA is correct that previous Commission decisions have required rate concessions complementary to some utility merger transactions. *See supra* note 16. However, in the present matter, the Commission repeatedly

transaction); 16 C.F.R. § 801.1(c) (defining prohibited pre-merger conduct to include direct or indirect changes in beneficial ownership); *see also* N.T., Sept. 14, 2005, at 531–31 (testimony of Verizon witness Taylor to his belief that post-transaction planning would have been illegal). *See generally* Reply Brief for Intervenor at 18-19 (explaining that statements relied upon by OCA "reflect only the reality that the companies could not engage in joint planning required to develop concrete plans for investment in and deployment of services that leverage both companies' complementary assets. That casts no doubt on the PUC's (and DOJ's and the FCC's) conclusions that robust intermodal competition in Pennsylvania will compel the combined company to invest in, develop, and deploy new and innovative services that enterprise and mass-market consumers in Pennsylvania demand and that the combination of the two companies makes possible.").

23. Along these lines, the ALJ and the Commission found, based on the evidence, that: there were market incentives on Verizon's part to invest more in MCI's network facilities than MCI could invest on its own, *see, e.g., Initial Decision,* 2006 WL 995853, at *61; the combined company could invest in those facilities at a lower cost of capital than MCI could obtain on its own, *id.;* and the increased investment would enable the new company to increase network capacity, extend network reach, and add new capabilities to the network, *id.* It was highlighted that Verizon had committed to invest at least two billion dollars nationally in MCI's network after the merger. Contrary to the OCA's suggestion, it seems highly unlikely that Pennsylvania would be entirely excluded from the benefits flowing from the infrastructure improvements given the integrated nature of the existing and planned networking. Further, the Commission and the ALJ accepted that, together, the companies would have the financial wherewithal and incentives to make the substantial investments needed to expand the capabilities of MCI's network and to support the innovative services that would be developed for, and delivered over, Verizon's local fiber network. *See id.*

referenced the recent and revolutionary changes affecting the telecommunications industry-including new market structure; rapid technological advances affecting business planning; intense intermodal competition; and altered business incentives, such as the resultant and continuing incentive for vast capital investments in infrastructure, research, and development-in support of its decision not to require price concessions or other special conditions beyond those required at the federal level. On this record, there is ample evidentiary support underlying the PUC's findings and conclusions in these regards. While there is also support for contrary propositions, the Commission was the designated finder of fact, and its factually-based determinations are entitled to respect where, as here, they are supported by substantial evidence. *Accord City of York*, 449 Pa. at 143, 295 A.2d at 829 ("In light of the Commission's explicit finding that the merger will affirmatively benefit the public, a finding fully supported by substantial evidence, there is no reason to remand this matter to the Commission."). Since the PUC is the agency charged with administration of the scheme of public utility regulation, and in light of its specialized expertise, its judgments concerning weight and balancing of associated policy considerations connected with utility certification is also entitled to the courts' considerable deference. *See Popowsky*, 550 Pa. at 457, 706 A.2d at 1201 (explaining that a decision based upon the weighing of economic evidence is within the PUC's area of expertise and reviewing courts should not substitute their own judgment on such matters); *cf. Constellation Energy*, 457 F.3d at 24. *See generally supra* note 17. It is for this reason that, upon a supported finding of public benefit, merger conditions rest within the sound discretion of the Commission. *See supra* note 21.[24]

24. It also should not be overlooked that the PUC found that additional price constraints were not only unnecessary, but also "may prove counterproductive to the interests of the mass market." *In re Verizon*, 2006 WL 995853, at *20; *id.* at *21 ("A rate cap ... would send improper cost signals and is not advisable under the facts of this proceeding."); *see also* R.R. at 683a (testimony of a Verizon witness that price caps "would distort outcomes in the competitive telecommunications marketplace and would ultimately harm consumers.").

Perhaps in light of the notion that guaranties must be present to support a finding of benefits, a proposition which we have now disapproved, the Commonwealth Court did not mention a number of benefits found by the ALJ and the Commission, including meaningful enhancements to national security, *see, In re Verizon,* 2006 WL 995853, at *6, *12 (adopting, *inter alia, Initial Decision,* 2006 WL 995853, at *62), and improvements in service quality, *see id.* at *12 (adopting, *inter alia, Initial Decision,* 2006 WL 995853, at *64) 31. Such advantages clearly add support to the PUC's central finding. Moreover, the sum and substance of the Commission decision is that the combined company with its strong resources, enhanced infrastructure, and increased operating efficiencies will benefit the public in the long term in ways that are as meaningful as short-term rate concessions. Indeed, the Commission's opinion makes it clear that its decision to accept a likelihood of longer-term benefits in lieu of more immediate price concessions is grounded in the same philosophy as the General Assembly's decision to move from cost-based to price-cap regulation-both decisions appear to incorporate the underlying understanding that, in a competitive environment, market forces will constrain price and encourage valuable innovation. The assumptions underlying such policy considerations are supported in the record in this case,[25] and the policy is entirely rational.[26]

**25.** *See* R.R. 497a (reflecting the testimony of a Verizon witness that, "given the already intense and growing competition in this industry, Verizon and MCI have strong incentives to provide high quality service at reasonable prices in all of the markets in which they operate" because, if they do not, they will "suffer severe consequences in the marketplace").

**26.** Indeed, the Commissions public interest analysis was conducted along lines very similar to those pertaining at the federal level, as developed by the FCC in the below passage from its opinion concerning the Verizon/MCI merger:

Our public interest evaluation necessarily encompasses the "broad aims of the Communications Act," which include, among other things, a deeply rooted preference for preserving and enhancing competition in relevant markets, accelerating private sector deployment of advanced services, ensuring a diversity of license holdings, and generally managing the spectrum in the public interest. Our public interest analysis may also entail assessing whether the merger

Again, the Commission's conclusions, grounded on Pennsylvania-specific evidence, are also entirely consistent with those of expert federal agencies, made in the broader, national landscape. Specifically, the FCC found:

[S]ignificant benefits are likely to result from the vertical integration of the largely complementary networks and facilities of Verizon and MCI. . . . We further find that this network integration will permit the merged entity to offer a wider range of services to its broad range of customers. Moreover, customers will benefit not only from the new services, but also from the improvements in performance and reliability resulting from the network integration.

\* \* \*

[B]y broadening its customer base, the merged entity will have an increased incentive to engage in basic research and development. We further find that continued intense competition from other carriers will provide sufficient incentives for the merged company to continue to invest in more applied research and development. As Verizon points out, it will have little choice but to continue investment and innovation. . . .

*In re Verizon*, 20 F.C.C.R. at 18533–36.[27] Similarly, with the divestitures that DOJ required, it found that the merger

will affect the quality of communications services or will result in the provision of new or additional services to consumers. In conducting this analysis, the Commission may consider technological and market changes, and the nature, complexity, and speed of, as well as trends within, the communications industry.
*In re Verizon*, 20 F.C.C.R. at 18443–44.

27. *Accord* FCC Press Release (October 31, 2005), *presently available at* http://fjallf oss.fcc.gov/edocs—public/attachmatch/DOC–261936A1.pdf (indicating that "consumers will reap the rewards of the public interest benefits that will flow from" the merger, including "integration of complementary networks, which will increase efficiency and provide consumers with new services and improved network performance and reliability"; the creation of a "stable, reliable U.S.-owned compan[y] that will provide improved service to government customers and benefit national defense and homeland security"; the realization of "economies of scale and scope, which should increase [the merged entity's] incentives and resources to engage in basic research and development"; and the attainment of "substantial cost savings, which should benefit consumers throughout the country").

would "not harm competition and [would] likely benefit consumers, due to existing competition, emerging technologies, the changing regulatory environment, and exceptionally large merger-specific efficiencies." R.R. at 955a (Department of Justice Press Release dated October 27, 2005). Contrary to suggestions by the Commonwealth Court and the OCA, we do not regard the Commission's references to the results of the federal investigations and accords as an abdication of its responsibility to conduct an independent, state-specific determination of public benefit. Instead, we believe that the federal and state findings are rationally and reasonably complementary. We also disapprove the notion that the Commission should be foreclosed from accepting the noted advantages as benefits pertaining in the Commonwealth on a developed Pennsylvania-specific record merely because they also pertain nationally.[28]

Finally, we recognize the primary benefit of the Verizon/MCI merger, at least in the short term, is to entities in the enterprise market. However, we agree with the Commission and Verizon that requiring that all types of customers receive unique, affirmative, and direct benefits from a transaction, would, in effect, prohibit transactions among companies which target their businesses to particular customer classes, even where other classes suffer no harm.[29] In any event,

28. We acknowledge the Consumer Advocate's point that other states have approved the Verizon/MCI merger only upon state-specific conditions. However, upon our review of applicable Pennsylvania law and the Commission's supported findings and conclusions, we see no need to further examine the particular regulatory schemes and attendant circumstances giving rise to such decisions arising in other jurisdictions, since, on this record, neither Section 1103 nor *City of York* requires additional conditions in Pennsylvania. Parenthetically, as Verizon notes, state commissions in various other jurisdictions approved the Verizon/MCI merger without conditions based upon applicable law, regulatory expertise, and fact finding. *See* Brief for Intervenor at 22–23 n. 10 (citing decisions from Delaware, Louisiana, Maryland, Minnesota, Mississippi, New Hampshire, North Carolina, Tennessee, Utah, West Virginia, Wyoming, and the District of Columbia).

29. *Accord* Reply Brief for Intervenor at 22 ("If OCA's position were accepted, the PUC would be required to reject a proposed merger that would benefit, for example, enterprise customers in Pennsylvania— which are large taxpayers; major employers of, and providers of

there was ample evidence of benefit to mass-market customers and the general public, as developed above and as credited by the PUC.

In summary, we agree with Appellants that the PUC considered an extensive evidentiary record and the comprehensive findings of two federal agencies; made numerous, sufficiently detailed, and supported findings of fact concerning the Verizon/MCI merger's likely net affirmative public benefits, which appropriately subsumed an assessment of the merger's probable effect on competition in the Commonwealth; and correctly applied the *City of York* standard. Thus, we hold that the PUC's conclusion that the Verizon/MCI merger will affirmatively promote the service, accommodation, convenience, or safety of the Pennsylvania public in some substantial way should have been sustained.

The order of the Commonwealth Court is reversed, and the Commission's order is reinstated.

Chief Justice CAPPY, Justices CASTILLE, EAKIN, BAER, BALDWIN and FITZGERALD join the opinion.

services to, Pennsylvania residents; and often significant contributors to charitable causes—and would cause no harm to any other group of customers in the Commonwealth, simply because those other groups would not receive a special benefit. Such a rule would present a barrier to beneficial transactions, and nothing in the statute or judicial precedent requires it.").